STATE of Minnesota, Respondent,

v.

Keith Hapana CROW, Appellant.

No. A06–229.

Supreme Court of Minnesota.

April 19, 2007.

Mary M. McMahon, Roseville, MN, for Appellant.

Lori Swanson, Attorney General, Kimberly Ross Parker, Assistant Attorney General, St. Paul, MN, Michelle Ann Dietrich, Redwood County Attorney, Redwood Falls, MN, for Respondent.

## OPINION

RUSSELL A. ANDERSON, Chief Justice.

Appellant Keith Hapana Crow was convicted and sentenced in Redwood County District Court for the crime of aiding and abetting first-degree murder in the course of a kidnapping, in violation of Minn.Stat. §§ 609.185(a)(3), 609.05, subd. 1 (2006), for the death of Robert Berry, Jr. On appeal, through counsel, Crow argues that his conviction was barred by double jeopardy, that the admission of expert testimony was reversible error, that the evidence was insufficient to support the conviction, and that his sentence is unconstitutional. By pro se brief, Crow makes additional claims. We affirm.

On September 23, 2004, Crow, then age 22, arranged to have a party at Shelly Williams' residence in Morton, Minnesota. At that time Crow and his 18–year–old girlfriend, Alicia Connor, were staying at his mother's home on the Lower Sioux reservation. Crow made arrangements with Tony Winkelman for transportation, first to the local casino and later to the Morton residence for the party. Winkelman, who had a Ford Expedition, regularly provided transportation for the residents of the Lower Sioux community. The party started around 10:30 p.m. and, because it was his party, Crow welcomed the guests as they arrived. The gathering grew to around 15 people and included 24–year–old Morris Pendleton, Jr., 19–year–old Vernon Jones, 17–year–old W.S., and 15–year–old J.P. Guests were drinking alcohol and smoking marijuana.

Berry, age 50, arrived at the party around midnight and soon confronted J.P. who was seated at the dining room table. Berry and J.P., the nephew of Berry's common-law wife, did not get along. When the confrontation between Berry and J.P. started, Winkelman, who was also

in the dining room, left with his wife. The confrontation escalated into a fist-fight and Berry threw J.P. to the floor. J.P. then called to Pendleton for help. Pendleton grabbed J.P., Crow grabbed Berry, there was punching and kicking, and Crow lost his glasses. When the fight ended, there was blood everywhere and Berry lay unconscious on the dining room floor. Pendleton went through Berry's wallet, J.P. ended up with some of Berry's jewelry, and Jones took the keys to Berry's Chevrolet Tahoe.

At that point, besides Berry, there were only eight people left at the Morton residence: Crow, Connor, Pendleton, Jones, J.P., W.S., Williams and 15–year–old L.B. They got into Berry's Tahoe and went for a ride, with Pendleton driving and Crow in the front passenger seat. Connor was in the back seat with Jones, J.P. and W.S., and Williams and L.B. were in the cargo area. During the ride, there was talk about what to do with Berry, starting with taking him home and leaving him passed out in his Tahoe. But then there was talk of killing Berry and throwing him in the river. Pendleton was concerned that Connor, Williams, or L.B. would say something about what had happened back at the Morton residence and told them not to tell anyone.

Pendleton drove the group to the west end of the reservation and then returned to the Morton residence where Berry remained unconscious on the dining room floor. Crow told Williams to unplug the phones and asked for a blanket, some rope, and a knife. Williams did not have any rope but showed him some blankets on a mattress downstairs and pointed to the kitchen. Crow instructed the men to wrap Berry in the blanket, which they did. All five men carried Berry out of the house, Crow opened the tailgate of Berry's Tahoe and they placed him in the cargo area of

the Tahoe. Crow told Williams and L.B. to clean up the blood, and Pendleton threatened harm to Williams' son if she told anyone. The five men and Connor got back into the Tahoe and left. Williams tried to clean up the blood but it was too messy and she was too upset. Afterwards, the Winkelmans returned to the Morton residence, found a distraught L.B., and took her home.

Pendleton drove the Tahoe to an area by the Minnesota River where there was a steep embankment leading down to the river. During the ride, Connor heard Berry moaning. Pendleton backed the Tahoe up to the edge of the embankment and stopped. All five men jumped out and dragged Berry down to the river. Connor waited near the vehicle. A short time later, the five men started to return, with Pendleton in the lead, followed by Crow who complained that his shoes were muddy. J.P. returned last, shirtless, and Pendleton said, "[W.S.] got him good."

Apparently having decided that they should burn the Tahoe, they drove around trying to find someone to follow them. They encountered two teenage girls who were at the party earlier in the evening. Crow, again in the front passenger seat, asked the girls to follow them, but the girls declined to do so. Pendleton drove to Winkelman's house, dropped off Jones and W.S., and Crow yelled for Winkelman to come out and follow them. Pendleton then drove to his father's home where he retrieved a gasoline can from the garage and returned to Winkelman's house. As Winkelman was outside explaining to Jones and W.S. that he was done driving for the night, Pendleton pulled the Tahoe into the driveway and Crow said, "Come on, give him a ride." Winkelman eventually agreed to drive Jones and W.S., who told him they were going to meet Crow. Jones and W.S. told Winkelman to turn onto the

dirt road leading to the river. But concerned there was something not "completely right," Winkelman did not make the turn, and instead continued on the county road leading to the highway. Pendleton, however, proceeded down the dirt road toward the river, dropped Crow and Connor off, and drove a bit further with J.P. to the location where they set the Tahoe on fire.

The Tahoe had already caught the attention of a tribal police officer, and when the vehicle turned down the dirt road, the officer pulled into the entrance of the road and called for assistance. After a second officer arrived, the two officers drove their marked SUVs down the road where they saw a vehicle on fire. Believing the first officer's SUV was Winkelman's vehicle, Connor waved the vehicle down with her cell phone light. Within a minute or two, Crow came up beside Connor. The others fled. Connor and Crow told the officer that they had just been in a fight with some men who they met at the casino and paid for a ride home. The officer had Crow complete a written statement form and drove Connor and Crow to Crow's mother's house, at which time the officer noticed that Crow was not wearing shoes or socks.

During the investigation of the burned-out Tahoe, law enforcement officers learned of the fight at the house in Morton, found items at that house belonging to Berry, including his wallet containing identification, and received a call from a local resident who had seen blood and a blanket down by the river. After dragging the river, law enforcement officers recovered Berry's body. The officers also found Crow's boots and sweatshirt near the area of the burned-out Tahoe and his sweatpants in a wooded area near his mother's house. Forensic testing of blood on the boots and clothing yielded profiles matching Berry's DNA.

Meanwhile, Crow, Connor, and J.P. left the area in the early morning hours of September 24 and traveled to Glencoe where they stayed in a motel for several hours. From there they traveled to Minneapolis and then to Bemidji, where Crow dyed his hair blonde. After a few days, Crow and Connor "ditched" J.P. and traveled to Seattle. When Connor learned the police were looking for them, Crow and Connor boarded a bus bound for Minneapolis and were apprehended in Billings, Montana.

Crow was indicted by grand jury in Redwood County for first-degree premeditated murder, Minn.Stat. § 609.185(a)(1) (2006); first-degree felony murder in the course of a kidnapping, Minn.Stat. § 609.185(a)(3); first-degree felony murder in the course of an aggravated robbery, Minn.Stat. § 609.185(a)(3); and aiding and abetting the above offenses, Minn. Stat. § 609.05 (2006). Connor was also charged in connection with Berry's death, but eventually pleaded guilty to aiding after the fact the offense of first-degree murder in the course of a kidnapping, as part of a plea agreement that conditioned her sentence upon truthful trial testimony. At Crow's trial, Connor testified about what she saw and heard at the party in the early morning hours of September 24, during the two trips in the Tahoe, and at the river. Other party guests testified that they saw Crow push and punch Berry and kick him in the face or chest. The state also presented the physical evidence and forensic analysis of the evidence collected during the investigation of the homicide, including Crow's boots and clothing with blood matching the victim's DNA profile. The medical examiner testified that Berry's body had 15 stab wounds to the chest

and that death was caused by exsanguination due to the multiple stab wounds.

Witnesses for the defense included a forensic scientist who testified about the effects of methamphetamine for purposes of discrediting the testimony of one of the state's witnesses and another witness who testified as to Crow's character for generosity. Crow testified on his own behalf and denied taking part in the assault and murder of Berry. He said that when the fight broke out, he ran over to try to break it up. As he was trying to separate Berry and J.P., Pendleton got involved, catching Crow in a backswing and knocking off his glasses. Crow then got down on his hands and knees to look for his glasses, not knowing at that point that his glasses were broken. When the fight ended, he called for Connor and tried to find a ride to his mother's house. He jumped into the front passenger seat of the only vehicle left at the house, thinking that he might be able to get a ride to his mother's house. But Pendleton, who was in the driver's seat, refused to take Connor and Crow to his mother's house. At the river, Crow said that he and Connor jumped out of the SUV and stayed near the vehicle while the other men went down by the river. He explained that he lost his boots, which were too big and not laced very well, in a "real rough" area near the burning vehicle, and his sweatshirt got caught on some branches so he took it off when the tribal officer was rushing them to get into the back of her vehicle. He left town with Connor so that he could "lay low" until everything cooled down and then return to clear his name. But on learning that the police were looking for them, they decided to return anyway.

The jury found Crow guilty of aiding and abetting first-degree felony murder while committing a kidnapping and aiding and abetting second-degree intentional murder, and not guilty of the remaining offenses. The court entered judgment on the first-degree murder conviction and imposed the mandatory life sentence without the possibility of release. This appeal from the judgment followed.[1]

## I.

◼ Crow argues that his first-degree murder conviction was barred by double jeopardy principles. At the close of the evidence and final arguments of counsel, the court instructed the jury that Crow had been charged with multiple offenses, that each offense was to be considered separately, and that the fact that the jury might find Crow guilty or not guilty as to one of the offenses "should not control your verdict as to any other offense." *See* 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal,* CRIMJIG 3.23 (5th ed.2006). The court instructed the jury on the three offenses charged in the indictment and, as agreed, on the lesser-included offense of second-degree intentional murder, and referred to the separate "guilty" and "not guilty" verdict forms that the jury would receive for each offense.

After several hours of deliberation, the jury informed the district court that it had reached a verdict. The clerk retrieved the verdict forms from the foreperson and read the verdict finding Crow guilty of the lesser offense, second-degree murder. As the court was about to poll the jury, the prosecutor asked the court if counsel could approach and, at a bench conference out of the hearing of the jury, pointed out that

---

1. In a separate trial, Morris Pendleton, Jr., was also convicted for the first-degree murder of Berry. We affirmed that conviction in

*State v. Pendleton,* 725 N.W.2d 717 (Minn. 2007).

the jury had not returned signed verdict forms for each offense. The court asked the foreperson if the jury had reached verdicts on the other offenses, and the foreperson responded that it had done so. When asked if the jury had reduced those verdicts to writing, the foreperson responded that it had not. Following another bench conference, the court sent the jury back to the jury room with instructions to sign and return the remaining verdict forms.

The jury returned shortly with a question about what effect a finding of not guilty on one offense would have on the other offenses. In response, the district court, with consent of both counsel, reread certain instructions, including CRIM-JIG 3.23. The jury thereafter returned with signed verdicts finding Crow guilty of first-degree felony murder in the course of a kidnapping, not guilty of first-degree premeditated murder, and not guilty of first-degree felony murder in the course of aggravated robbery. The jury was polled and confirmed that their verdicts were unanimous. In reliance on *Green v. United States*, 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957), Crow argues that when the jury returned a verdict on a lesser-included offense and was silent on the greater offenses, there was an implied acquittal on the greater charges.

▪ The Double Jeopardy Clause of the United States Constitution provides, "No person shall * * * be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. Jeopardy attaches when the jury is empanelled and sworn in a jury trial. *Serfass v. United States*, 420 U.S. 377, 388, 95 S.Ct. 1055, 43 L.Ed.2d 265 (1975) (stating that in a jury trial, "jeopardy attaches when a jury is empanelled and sworn. In a nonjury trial, jeopardy attaches when the court begins to hear evidence." (citations omit-

ted)). An acquittal of an offense bars retrial for that offense, but double jeopardy does not bar retrial when a conviction is later set aside for trial error. *See United States v. Ball,* 163 U.S. 662, 671–72, 16 S.Ct. 1192, 41 L.Ed. 300 (1896). In *Green,* the Supreme Court held that a conviction of a lesser offense constituted an implied acquittal of the greater offense, barring retrial of the greater offenses following a successful appeal of the lesser-offense conviction. *Green,* 355 U.S. at 190, 78 S.Ct. 221. In *Green,* the jury had returned a guilty verdict on the lesser offense but no verdict on the greater offense. The district court accepted the verdicts, entered judgment, and dismissed the jury. *Id.* at 186, 78 S.Ct. 221.

▪ Unlike *Green,* Crow was not twice put in jeopardy for an offense following a jury trial and successful appeal. Further, "a verdict is not final for purposes of double jeopardy simply because it is announced by the jury foreman in open court." *United States v. Hiland,* 909 F.2d 1114, 1138 (8th Cir.1990). Under Minnesota law, a verdict is not complete unless deliberations are over, the verdict is read in open court, and no dissent is expressed by the jury. Minn.Stat. § 631.17 (2006) (providing that if, after filing and reading the verdict, no disagreement is expressed by the jury, the verdict is complete). On return of a guilty verdict, the accused has the right to have the jury polled. Minn. R.Crim. P. 26.03, subd. 19(5). If the poll "does not conform to the verdict, the jury may be directed to retire for further deliberation or may be discharged." *Id.* The record here establishes that the district court sent the jury back to the jury room before polling ever took place. The verdicts were not final until the jury completed and returned all verdict forms, the verdicts were read in open court, and the jury polled. There was no implied acquittal,

and Crow's conviction was not barred by double jeopardy.

## II.

Crow asserts reversible error in the admission of opinion testimony of Dr. Paul Nora, the medical examiner who conducted the autopsy, as to the number of assailants. In a foundational hearing outside the presence of the jury, Dr. Nora testified that in his opinion, it was "more likely that there were multiple stabbers than one stabber." He based this opinion on his evaluation of the wounds on the body as well as on "[c]ommon sense and also the circumstances provided me by the investigators." Using a mannequin and ruler as a knife, Dr. Nora demonstrated his theory, noting that "as you see, I'm sweating quite vigorously, this is quite an exercise, this is a workout. Most people are going to do this in the easiest fashion that they can, and in my opinion that represents to me more than one stabber."

When the court asked if other forensic pathologists employed this analysis, Dr. Nora stated: "we use it all the time in our own office in terms of discussing a scenario. Whether or not other members of my—my collegial affiliation are willing to go ahead and get on the stand and say that, I can't answer that." Following the hearing, Dr. Nora was permitted to repeat the demonstration for the jury and provide his opinion on multiple assailants. Dr. Nora also said that it was "[a]bsolutely" possible that there was just one assailant. On cross-examination, he stated that he "never said that it had to be multiple stabbers" and acknowledged that the pros-ecution had arranged his transportation from Michigan to Minnesota for this trial.[2]

In response to Dr. Nora's testimony, defense counsel presented the testimony of Dr. Lindsey Thomas[3] who testified that a determination of the number of assailants involved in a homicide by stabbing is beyond the expertise of a medical examiner: "[T]here isn't really any way we can tell based on the wounds how many people were involved in a stabbing. I mean, sometimes we can get an idea about if different knives were used, but still that wouldn't tell anything about whether it was one person with multiple knives or not."

Expert testimony is admissible if it will assist the trier of fact in evaluating evidence or resolving factual issues. *See State v. Blanche*, 696 N.W.2d 351, 372 (Minn.2005). A qualified expert may testify in the form of an opinion if the expert's "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Minn. R. Evid. 702. The opinion, however, "must have foundational reliability. In addition, if the opinion or evidence involves novel scientific theory, the proponent must establish that the underlying scientific evidence is generally accepted in the relevant scientific community." *Id.* The district court, which has broad discretion to admit expert testimony, *State v. Lopez–Rios*, 669 N.W.2d 603, 612 (Minn.2003), must also determine whether the testimony is relevant, and whether its prejudicial effect substantially outweighs its probative value. *State v.*

**2.** Dr. Nora, a family practitioner for 12 years, returned to school in 1999, did a pathology residency and then a 1–year fellowship in forensics in Detroit. He was employed by the Ramsey County Medical Examiner's Office for 23 months, after which he returned to Michigan where, at the time of this trial, he was employed as a medical examiner in Oakland County, Michigan.

**3.** Dr. Thomas has been a coroner since 1987 and is also a pathologist with the Regina Medical Center.

*Grecinger,* 569 N.W.2d 189, 193 (Minn. 1997).

■ Generally, a forensic pathologist may testify "to things such as the number and extent of the wounds, the amount of bleeding, * * * whether the wounds could or could not have been the result of accident, the cause of death, and so forth." *State v. Chambers,* 507 N.W.2d 237, 239 (Minn.1993); *see generally* Andre A. Moenssens, Ray Edward Moses & Fred E. Inbau, *Scientific Evidence in Criminal Cases* 186–87 (1973) (discussing typical determinations made by the pathologist in cases of cutting and stabbing). However, a pathologist may not testify to matters beyond his expertise. *See, e.g., State v. Bauer,* 598 N.W.2d 352, 369 (Minn.1999) (affirming district court's confinement of pathologist's testimony to limits of his expertise).

■ Crow argues that the admission of Dr. Nora's multiple-assailant testimony failed the foundational reliability and helpfulness criteria of Rule 702, and this appears to be a legitimate complaint. We need not determine, however, whether admission of this testimony was an abuse of discretion because error, if any, was harmless. *Cf. Lopez–Rios,* 669 N.W.2d at 613 (holding that error in the admission of gang expert testimony was harmless). The testimony was equivocal at best; the pathologist was effectively cross-examined; Crow called his own expert in rebuttal; he was charged with accomplice liability; and there was no reasonable possibility that the expert's testimony substantially influenced the guilty verdict.

### III.

■ Crow argues that the evidence was insufficient to support the jury's verdict. Our review of the sufficiency of the evidence is "limited to a painstaking analysis of the record to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict which they did." *State v. Webb,* 440 N.W.2d 426, 430 (Minn.1989). We will not disturb the verdict if the jury, while acting with due regard for the presumption of innocence and requirement of proof beyond a reasonable doubt, could reasonably conclude that the defendant was guilty of the charged offense, given the facts in evidence and the legitimate inferences that could be drawn therefrom. *Bernhardt v. State,* 684 N.W.2d 465, 476–77 (Minn.2004); *State v. Robinson,* 604 N.W.2d 355, 365–66 (Minn.2000).

■ Crow asserts that the state failed to establish accomplice liability. A person is criminally liable for a crime committed by another if he intentionally aids, advises, hires, counsels, or conspires with another person, or otherwise procures another person to commit the crime. Minn. Stat. § 609.05, subd. 1 (2006). To impose liability under the aiding and abetting statute, the state must show that the defendant played a knowing role in the commission of the crime. *State v. Gates,* 615 N.W.2d 331, 337 (Minn.2000). Mere presence at the crime scene does not alone prove that a person aided or abetted, because inaction, knowledge, or passive acquiescence do not rise to the level of criminal culpability. *See id.; State v. Russell,* 503 N.W.2d 110, 114 (Minn.1993). "However, active participation in the overt act that constitutes the substantive offense is not required, and a defendant's presence, companionship, and conduct before and after an offense is committed are relevant circumstances from which the jury may infer criminal intent." *Gates,* 615 N.W.2d at 337.

Here, evidence of Crow's knowing role in the commission of first-degree murder

(kidnapping) and circumstances from which criminal intent may be inferred included testimony that Crow sought and obtained a blanket; that he directed the other men to wrap the victim in the blanket; that all five men carried the victim out of the house; that Crow opened the tailgate of the victim's SUV so they could place the victim in the cargo area; that Crow directed Williams and L.B. to clean up the blood in the residence; that all five men traveled in the SUV to the location in Redwood County where the victim was dragged down an embankment to the river; that all five men went down to the river bank where the victim was stabbed; that after the group returned to the reservation, Crow aided in attempts to get someone to follow them to where the Tahoe was set on fire; that he abandoned his boots and sweatshirt near the burning vehicle; and that both items had blood matching the victim's DNA profile. There was also evidence of flight and an attempt by Crow to persuade Connor to withdraw her plea so that she would not have to testify against him. Viewed in a light most favorable to the verdict, there was ample evidence to support the jury's finding of guilt.[4]

## IV.

■■■■ Crow argues that his sentence violates the Cruel or Unusual Punishment Clause of the Minnesota Constitution. Minn. Const. art. I, § 5. The district court sentenced Crow under Minn.Stat. § 609.106, subd. 2(2) (2006), which mandates a life prison term without the possibility of release for a person convicted of committing first-degree murder during the course of a kidnapping, in violation of Minn.Stat. § 609.185(3).[5] "Statutes are presumed constitutional, and a person challenging a sentence as cruel or unusual 'bears the "heavy burden" * * * of showing that our culture and laws emphatically and well nigh universally reject' the sentence." *State v. Heden,* 719 N.W.2d 689, 698 (Minn.2006) (citations omitted).

Crow argues that the statute is unconstitutional as applied to him, relying on cases related to whether the removal or confinement of the victim for purposes of committing a rape or murder was sufficient, or criminally significant, to constitute a kidnapping. *See, e.g., State v. Earl,* 702 N.W.2d 711, 722–23 (Minn.2005); *State v. Welch,* 675 N.W.2d 615, 620–21 (Minn. 2004); *State v. Smith,* 669 N.W.2d 19, 32–33 (2003). Because the removal in this case was criminally significant, this line of cases is inapposite.

Crow further asserts that the sentence unfairly exaggerates the criminality of his conduct where he was acquitted of premeditated murder and was not a participant in the homicide. But the punishment for both first-degree premeditated murder and first-degree murder committed during a kidnapping is now commensurate and we have already determined that the evidence was sufficient to support the conviction for which he was sentenced. Crow has not established his claim of cruel or unusual

---

4. In challenging the evidentiary basis for his conviction, Crow asserts undue prejudice in the exclusion of testimony of his cultural witness to explain how the value and belief systems within the Native American community operate. As the district court concluded, the proposed testimony would not have been helpful to the jury in the resolution of Crow's guilt. *See United States v. Sayakhom,* 186 F.3d 928, 936 (9th Cir.1999) (affirming the exclusion of testimony of cultural expert from Laos where proffered testimony would not have helped the jury).

5. In 2005, the legislature expanded the list of first-degree murder convictions subject to mandatory life without release. Act of June 2, 2005, ch. 136, art. 17, § 9, 2005 Minn. Laws 903, 1127.

punishment. *Cf. Heden,* 719 N.W.2d at 698 (holding that life imprisonment without the possibility of release for first-degree murder while committing first-degree criminal sexual conduct did not violate the Cruel or Unusual Punishment Clause).

### V.

By pro se supplemental brief, Crow asserts constitutional error in the admission of out-of-court statements, prosecutorial misconduct, and judicial bias. The out-of-court statements to which Crow refers were not testimonial and therefore not subject to exclusion under *Crawford v. Washington,* 541 U.S. 36, 61, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Crow asserts the prosecutor "made a point to say prison" in cross-examination about a prior conviction, but we found no such reference in our review of the record. Crow's remaining claims of improprieties were properly ruled upon by the district court. Criminal defendants have a constitutional right to be tried before a fair and impartial judge. *Bracy v. Gramley,* 520 U.S. 899, 904–05, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997). The Due Process Clause requires that a defendant receive a "fair trial in a fair tribunal before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Id.* (quotation and citation omitted). We have independently reviewed the record and are satisfied that Crow had a fair trial before an impartial judge.

Affirmed.