STATE of Minnesota, Respondent,

v.

Jonard Brandon McDANIEL,
Appellant.

No. A07–2160.

Supreme Court of Minnesota.

Jan. 21, 2010.

Lori Swanson, Attorney General, St. Paul, MN, Michael O. Freeman, Hennepin County Attorney, Linda K. Jenny, Assistant County Attorney, Minneapolis, MN, for respondent.

Bradford Colbert, Legal Assistance to Minnesota Prisoners, St. Paul, MN, for appellant.

## OPINION

MAGNUSON, Chief Justice.

Appellant Jonard Brandon McDaniel was indicted in Hennepin County District Court for aiding and abetting first-degree

premeditated murder, under Minn.Stat. § 609.185(a)(1) (2008) and Minn.Stat. § 609.05, subd. 1 (2008), and committing a crime for the benefit of a gang, under Minn.Stat. § 609.229 (2008). The State alleged that McDaniel aided and abetted Cornelius Jackson and LaMonte Martin in killing Christopher Lynch. A Hennepin County jury found McDaniel guilty of both counts. Judgment of conviction was entered for aiding and abetting first-degree premeditated murder and crime committed for the benefit of a gang, and McDaniel was sentenced to life in prison without the possibility of release. We affirm.

During the evening of May 3, 2006, 19-year-old Christopher Lynch was shot and killed in a residential neighborhood in North Minneapolis. He was shot 11 to 13 times.

Jermaine Mack–Lynch, Lynch's cousin, is a former member of the Tre Tre Crips gang. Mack–Lynch testified for the State and described the rivalry between the Tre Tres and the "One–Nines," also known as the "Nineteen Block Dipset," which included "shootouts back and forth." Mack–Lynch knew McDaniel, Jackson, and Martin as members of the One–Nines.

Mack–Lynch testified that on May 3, he and Lynch were going to the house of Charles Pettis—Mack–Lynch's brother—in Minneapolis. As they were walking, Mack–Lynch saw McDaniel, Martin, and Jackson go by in a white Chevy Malibu, which Martin was driving. Jackson was in the back seat, and McDaniel was in the front passenger seat. The car stopped and Martin and Jackson got out with guns in their hands. Mack–Lynch and Lynch then started running because they "knew who they were and they had guns in their hands."

Mack–Lynch and Lynch ran down the alley between Upton and Thomas Avenues, while Jackson and Martin ran toward the alley between Sheridan and Thomas Avenues. When Mack–Lynch and Lynch got to the end of the alley, Mack–Lynch saw the white Malibu "fl[ying] back" and "fl[ying] on this way." He also saw Jackson and Martin coming from behind a house with guns in their possession. When Mack–Lynch and Lynch got to the alley between Seventh and Thomas, Lynch, who had asthma and was heavyset, said that he was tired and wanted to cut through a yard. Mack–Lynch told Lynch that he would continue down the alley in an attempt to have Martin and Jackson follow him, so that Lynch could safely cut through the yard to Pettis's house.

Mack–Lynch ran down the alley and continued to the front door of Pettis's house. When he entered, he told his brother that "One Nines" were chasing him and asked if Lynch was in the house. Pettis responded that he was not. As Mack–Lynch and Pettis went outside to look for Lynch, they heard shots. Mack–Lynch saw Jackson and Martin "shooting at something" in the backyard across the street. As Mack–Lynch and Pettis approached, Jackson and Martin got into the Chevy Malibu and drove off. Mack–Lynch could not identify the driver of the car, but said that the driver was an African–American male. McDaniel is African American.

Mack–Lynch and Pettis discovered Lynch lying in the backyard where the shots had been fired. When the police arrived, Mack–Lynch told them that Jackson, Martin and McDaniel were the three people in the car. He subsequently identified the three in a photo lineup.

Several other witnesses testified about the events of May 3. Pettis told the jury that on May 3, Mack–Lynch came running into the house, saying "One–Nine chasing me and Chris." When Pettis went outside the house to look for Lynch, Pettis saw

Jackson and Martin standing in the yard across the street with guns. Pettis saw Lynch lying on the ground and Jackson and Martin jump into a white car. Pettis identified the driver of the car as an African–American male.

Ten-year-old S.H., who lived next door, testified that he saw two men chase Lynch, and then saw Lynch stop and put his hands up "saying I quit, I quit" before one of the men shot him six or seven times. S.H. also saw the two men get into a white car after the shooting.

The State also called 19–year–old Paris Patton as a witness. Patton was in federal custody for selling drugs and possessing a firearm, and had entered a plea agreement with the federal government that called for a possible reduction of his sentence in exchange for his testimony. Patton testified that he was a One–Nine for approximately 2 years, that McDaniel, Martin and Jackson were also One–Nines, and that McDaniel started the group. He also testified that the rivalry between the Tre Tres and the One–Nines sometimes involved "gunfights."

Patton spoke with McDaniel a few days after the shooting. McDaniel asked Patton if he had a gun because McDaniel had to get rid of his gun. Patton recounted the conversation where McDaniel initially said, "we killed that little boy." McDaniel told Patton that he had tried to box in Mack–Lynch and Lynch and as a result, crashed the car. McDaniel also told Patton that Lynch was "on his knees begging for his life" when Jackson shot him and that Lynch was shot because "they couldn't get to Jermaine [Mack–Lynch]." According to Patton, Mack–Lynch was the target because he was a member of the Tre Tres.

McDaniel testified that on May 3, he was shooting dice with ten to fifteen people in Lincoln Park. Jackson, Martin and a third man, Marcus White, pulled up in an "off white" car, and McDaniel got into the car with them. They were smoking "blunts," cigars in which the tobacco is removed and replaced with marijuana. McDaniel testified that they went to a store to buy more cigars, Martin driving, Jackson in the front passenger seat, and McDaniel in the back next to White. While they were driving, Jackson pointed out Mack–Lynch, but McDaniel denied knowing who Mack–Lynch was. Later on cross-examination, McDaniel admitted that he knew Jackson was referring to "Tre Tre Jermaine." McDaniel testified that after Jackson saw Mack–Lynch, Martin, Jackson, and White then dropped McDaniel off in Lincoln Park and he immediately left with a friend.

Renardo Smith, a member of the Conservative Vice Lords gang, also testified for the State. He entered a plea agreement with the government to testify in exchange for a possible reduced sentence for drug charges. Smith testified that McDaniel was a member of both the One–Nines and the Conservative Vice Lords. On May 17, he told McDaniel that the police had just left McDaniel's cousin's house and they were looking for McDaniel. According to Smith, McDaniel responded that he knew that the police were looking for him, but "that he didn't even do nothing, it was Monte [Martin] and Corn [Jackson] who did it, he was just driving."

Officer Cheri Petersen from the Minneapolis Police Department testified about the steps that she and other officers took to locate McDaniel following Lynch's murder. Officer Petersen stated that after the May 3 shooting, she spoke with McDaniel's mother, girlfriend, cousin, and friend on four separate occasions. During each encounter, she told them that a warrant had been issued for McDaniel's arrest, left business cards with all four, and asked

them to have McDaniel call Officer Petersen. A few hours after Officer Petersen's visit to McDaniel's girlfriend's apartment, McDaniel called Officer Petersen and told her that he was not going to turn himself in. Officer Petersen asked Minneapolis police officer Gerald Wallerich to talk to McDaniel because Officer Wallerich had spoken with McDaniel in the past.

The police arrested McDaniel on May 23 at a home in South Minneapolis. A resident of the house testified that she was initially in the basement, and then went upstairs to wake her sister when she heard the police arrive. When the woman went back downstairs, she saw McDaniel come down and hide under the bed. The police came downstairs and found McDaniel hiding under the bed.

McDaniel testified in his own defense. He denied being a leader of the One–Nines, but upon cross-examination, admitted that he used to be the "chief" and had "some say-so" with the gang. He also testified that the Tre Tres are "not good friends of mine" since a member of the Tre Tres had shot him in the neck, and when the two gangs met, there would often be shootouts.

On rebuttal, Officer Gerald Wallerich testified for the State. He spoke with McDaniel on May 23 and told McDaniel that this was McDaniel's opportunity to tell his side of the story. However, McDaniel did not tell Officer Wallerich about his claimed activities leading up to the shooting—shooting dice at Lincoln Park, being picked up by Martin, Jackson and White, or about meeting a friend and leaving the park.

Several other Minneapolis police officers testified regarding the activities of the One–Nine gang in 2003 and 2004, involving the sale of narcotics. In January, April, and August 2005, McDaniel told the police that he was a member of the One–Nine gang. In addition, a Tre Tre gang member testified that on May 8, 2004, a group of One–Nines, including McDaniel, approached him, McDaniel tried to punch him, and when he tried to leave, another member of the One–Nines shot his car.

Captain Michael Martin, a police officer from the Minneapolis Police Department, testified as a "gang expert." He testified as to the role of fear, respect, and retaliation in gang culture generally to explain why a gang member would retaliate against a non-gang member. Specifically, Martin testified that when respect-challenging incidents occur, gangs retaliate to maintain respect by exchanging words or exchanging gunfire. He stated that gang members occasionally murder someone who is close to a rival gang, but not a member, to scare people away from associating with the rival gang.

The jury found McDaniel guilty of aiding and abetting first-degree premeditated murder and committing a crime for the benefit of a gang. Judgment of conviction was entered on both counts, and the court sentenced him to life in prison without the possibility of release for aiding and abetting first-degree premeditated murder. This appeal followed.

I.

McDaniel first argues that the trial court erred in allowing the State to introduce evidence of flight to show consciousness of guilt, because he was not aware he was a suspect in the May 3 shooting. McDaniel contends that until he called Officer Petersen, McDaniel did not "even [know] the police were looking for him." McDaniel also argues that because he has a constitutional right not to "give his side of the story," the district court admitted evidence of his alleged flight in error, which substantially influenced the

jury's decision. We review a district court's admission of evidence for a clear abuse of discretion. *State v. Amos*, 658 N.W.2d 201, 203 (Minn.2003). McDaniel bears the burden of establishing an abuse of discretion. *See id.*

The United States Supreme Court and this court have generally drawn a line between pre-*Miranda* warning silence and post-*Miranda* warning silence. Although a prosecutor cannot use a defendant's post-*Miranda* warning silence for impeachment purposes, *Doyle v. Ohio*, 426 U.S. 610, 611, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *State v. Billups*, 264 N.W.2d 137, 139 (Minn.1978), impeachment of an accused by his *pre-arrest* silence is not constitutionally improper when a defendant chooses to testify in his own defense, *Jenkins v. Anderson*, 447 U.S. 231, 238–39, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980). *See also Raffel v. United States*, 271 U.S. 494, 497, 46 S.Ct. 566, 70 L.Ed. 1054 (1926) (recognizing that no violation of the Fifth Amendment occurs when a defendant testifies in his own defense and is impeached with his prior silence). When a defendant testifies on his own behalf, he does so as any other witness and the State may impeach his credibility on cross-examination as is permitted for any other witness. *Jenkins*, 447 U.S. at 235–36, 100 S.Ct. 2124 (citing *Grunewald v. United States*, 353 U.S. 391, 420, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957)).

In *Jenkins*, the defendant was charged with first-degree murder, and the defendant claimed that he committed the crime in self-defense. 447 U.S. at 232, 100 S.Ct. 2124. The killing occurred on August 13, but the defendant did not turn himself in to the police until 2 weeks later. *Id.* At the trial, during both cross-examination and closing argument, the prosecutor attempted to impeach the defendant's credibility "by suggesting that the petitioner would have spoken out if he had killed in self-defense." *Id.* at 233–35, 100 S.Ct. 2124. In holding that such impeachment was permissible, the Court stated, "impeachment follows the defendant's own decision to cast aside his cloak of silence and advances the truth-finding function of the criminal trial." *Id.* at 238, 100 S.Ct. 2124.

Additionally, in *State v. McTague*, we determined that

[f]light before apprehension or after arrest ... is a circumstance to be considered—not as a presumption of guilt, but as something for the jury [to consider]—as suggestive of a consciousness of guilt; and the same is true of an attempt to escape or resisting arrest or passing under an assumed name.

190 Minn. 449, 453, 252 N.W. 446, 448 (1934). Therefore, we held that evidence of the defendant's forfeiture of a fidelity bond, flight from the state and country, use of an assumed name, and resisting arrest were all admissible. *Id.* at 453–54, 252 N.W. at 448.

We hold that it was not error for the district court to admit evidence of McDaniel's pre-arrest conduct. There was sufficient evidence that McDaniel knew that he was a suspect in the Lynch murder. The police attempted to locate McDaniel, spoke to his mother, girlfriend, friend, and cousin, and requested that each tell McDaniel to contact Officer Petersen. McDaniel did just that. In addition, Officer Petersen told McDaniel that he was wanted for murder, that this was McDaniel's "chance to tell [his] side," and that there was a warrant issued for his arrest. McDaniel responded that he was not going to turn himself in.[1] Furthermore, he was hiding

---

1. The district court specifically cautioned the jury that McDaniel had "no legal obligation to

under a bed when the police arrested him, and he made numerous statements regarding his knowledge that "the police [were] going to be coming to where everybody was at" and that he "already knew" that the police were looking for him.

McDaniel relies on *Ricks v. Commonwealth*, 39 Va.App. 330, 573 S.E.2d 266 (2002), a Virginia Court of Appeals case, to assert that if a defendant does not know he is a suspect, then he is not making a conscious decision to flee and not demonstrating consciousness of guilt. *Ricks* simply requires a nexus between a defendant's "consciousness of guilt" and the crime being investigated. *Id.* at 269. The fact that McDaniel may have had another reason to avoid the police does not alone render the evidence inadmissible. Rather, McDaniel's motivations for refusing to speak to police involve a credibility determination that properly rests with the jury. *See State v. Bias*, 419 N.W.2d 480, 485 (Minn.1988) (admitting evidence of flight where defendant offered an alternative explanation because, "[n]evertheless, evidence of flight suggests consciousness of guilt. The jury could and apparently did find the circumstances surrounding his abrupt departure to be incriminating." (citations omitted)).

There was evidence that McDaniel was aware that he was a suspect in the Lynch murder, and McDaniel's arguments go to the weight of the evidence—not its admissibility. We find no merit in McDaniel's arguments regarding evidence of flight.

## II.

■■■ McDaniel next argues that the district court erred in admitting certain gang evidence and the testimony of Captain Michael Martin of the Minneapolis Police Department as the State's "gang expert." Under Minn. R. Evid. 702, expert testimony is admissible if it will assist the jury in evaluating evidence or resolving factual issues. *State v. Grecinger*, 569 N.W.2d 189, 195 (Minn.1997). The admissibility of expert testimony "generally rests within the sound discretion of the district court and will not be reversed unless there is clear error." *State v. Koskela*, 536 N.W.2d 625, 629 (Minn.1995). Where gang expert testimony is erroneously admitted, we consider whether the error "substantially influenced" the jury's verdict. *State v. DeShay*, 669 N.W.2d 878, 888 (Minn.2003); *State v. Lopez–Rios*, 669 N.W.2d 603, 613 (Minn.2003).

■■■ In *DeShay* and *Lopez–Rios*, we cautioned that gang expert testimony should be admitted only if it is helpful to the jury in making the specific factual determinations that jurors are required to make. *DeShay*, 669 N.W.2d at 885–86; *Lopez–Rios*, 669 N.W.2d at 612. To be admissible, gang expert testimony

> must add precision or depth to the jury's ability to reach conclusions about matters that are not within its experience. Moreover, this testimony must be carefully monitored by the [district] court so that the testimony will not unduly influence the jury or dissuade it from exercising its independent judgment. Even if acceptable under Rule 702, expert testimony should be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.

*DeShay*, 669 N.W.2d at 888 (citing Minn. R. Evid. 403).

In *DeShay* and *Lopez–Rios*, we held that the admission of expert testimony on general gang activities and gang affiliation was error. *DeShay*, 669 N.W.2d at 888; *Lopez–Rios*, 669 N.W.2d at 613. In *DeSh-*

turn [himself] in or to come in and tell [his] side of the story" to avoid any appearance of

comment on McDaniel's Fifth Amendment right against self-incrimination.

*ay*, we held that much of the gang expert's testimony was erroneously admitted because it was duplicative, giving little assistance to the jury in evaluating the evidence in a "noncomplex drug conspiracy case." 669 N.W.2d at 888. In *Lopez–Rios*, we likewise held that the gang expert's testimony on general gang activities and gang affiliation was erroneously admitted as largely duplicative of previous witness testimony, and we found troublesome the expert's testimony that the defendant was a member of a criminal gang. 669 N.W.2d at 612–13. However, we affirmed the convictions in both cases because any error was harmless. *DeShay*, 669 N.W.2d at 888; *Lopez–Rios*, 669 N.W.2d at 613.

In *State v. Jackson*, 714 N.W.2d 681 (Minn.2006), by contrast, we were more accepting of the State's gang expert testimony. In *Jackson*, the State's gang expert testified about the Bloods gang generally, discussing the gang's identifying hand signs and colors and the criminal activities in which Bloods gang members are involved. *Id.* at 689. The expert also testified about the role of respect in Bloods culture. *Id.* In addition, he stated that the defendant was associated with the Bloods gang and that, in his opinion, the victim was "murdered for the sake of the Bloods, [for] showing disrespect." *Id.*

We affirmed the conviction and held that the expert's testimony was admissible because it helped the jury decide "whether the commission of crimes is one of the primary activities of the Bloods gang, a prerequisite for proving that the Bloods gang meets the statutory definition of a 'criminal gang.'" *Id.* at 692 (citing Minn. Stat. § 609.229 (2004)). Further, we held that the testimony was helpful in proving motive and was "neither belabored nor excessive." *Id.*

Here, the district court did not err when it admitted gang evidence and expert testimony. McDaniel was charged with aiding and abetting Lynch's murder for the benefit of a gang. Up until the close of the State's evidence, when McDaniel affirmatively stated on the record that he was not requesting that any lesser included offenses be submitted to the jury, the prosecutor could not be absolutely certain about the impact of the count of crime committed for the benefit of a gang. *See* Minn.Stat. § 609.229, subd. 3 (defining the effect on sentencing of a conviction for a crime committed for the benefit of a gang together with various other convictions). Thus, we reject the argument that the charge was extraneous.

McDaniel also acknowledges that the gang evidence here was significantly limited by the trial court. The judge allowed expert testimony only in the most general of terms, which was then supplemented by specific factual evidence from lay witnesses. There was very little redundancy, and any repetition was within acceptable limits. We find the evidence here to be very similar to that which we approved in *Jackson*. McDaniel admitted his own gang activity and lay witnesses identified him as a gang member. In addition, the statute required the State to show that the motive for chasing Mack–Lynch was gang related and that the One–Nines comprised a criminal gang. *See* Minn.Stat. § 609.229, subds. 1–2.

Additionally, although McDaniel himself admitted that he was a member of the One–Nine gang and other witnesses testified to this same fact, the purpose and substance of Captain Martin's testimony was to describe gang culture generally, and the role of retaliation and respect in gang culture. Furthermore, Captain Martin did not offer his opinion regarding whether the murder of Lynch was rooted

in gang retaliation and did not directly implicate McDaniel. *See State v. Burrell,* 772 N.W.2d 459, 469 (Minn.2009) (concluding that admission of gang evidence that did not directly implicate the defendant, if erroneous at all, was harmless). Instead, as in *Jackson,* Captain Martin's testimony assisted in the determination of whether the One–Nines constituted a "criminal gang" under Minn.Stat. § 609.229, and was helpful to prove motive. *See Jackson,* 714 N.W.2d at 692. We hold that the district court did not err in admitting gang evidence and gang expert testimony.

### III.

■■ McDaniel next argues that prosecutorial misconduct deprived him of a fair trial. Our standard of review depends on whether or not there was an objection at trial to the claimed misconduct. *State v. Wren,* 738 N.W.2d 378, 390, & n. 9 (Minn. 2007). When defense counsel does not object to alleged prosecutorial misconduct, we review the conduct under a modified plain error test. *State v. Ramey,* 721 N.W.2d 294, 302 (Minn.2006). The defendant has the burden of proving that an error was made, and that it was plain. *Id.* If the defendant satisfies this burden, the burden shifts to the State to demonstrate that the error did not affect the defendant's substantial rights. *Id.* An error affects a defendant's substantial rights if there is a reasonable likelihood that the error actually impacted the verdict. *Id.*

In *State v. Caron,* this court laid out a two-tiered approach for objected-to prosecutorial misconduct based on the seriousness of the misconduct. *See State v. Caron,* 300 Minn. 123, 127–28, 218 N.W.2d 197, 200 (1974). We have not yet decided whether this two-tiered approach set forth in *Caron* "remains viable." *State v. Graham,* 764 N.W.2d 340, 348 (Minn.2009). Under the *Caron* standard, for objected-to

prosecutorial misconduct, we apply a harmless error test, "the application of which varies based on the severity of the misconduct." *Wren,* 738 N.W.2d at 389. When the case involves less serious prosecutorial misconduct, we have asked "whether the misconduct likely played a substantial part in influencing the jury to convict." *Caron,* 300 Minn. at 128, 218 N.W.2d at 200. For more serious prosecutorial misconduct, we have reversed unless the misconduct is harmless beyond a reasonable doubt. *Id.* at 127, 218 N.W.2d at 200.

McDaniel has alleged numerous instances of prosecutorial misconduct that he claims occurred during the opening statement, examination of witnesses, and closing argument. Some instances were objected to; others were not. Although McDaniel generally made objections regarding the alleged misconduct during witness examination, McDaniel did not make any objections during the prosecutor's opening statement or closing argument. For purposes of this analysis, we will assume that all instances were objected to, and determine whether the alleged misconduct entitles McDaniel to a new trial. *See Wren,* 738 N.W.2d at 390, n. 9. We are able to resolve McDaniel's claims without reaching the issue of whether the *Caron* analysis is still viable.

#### 1. Arguing Facts Not in Evidence

■■ McDaniel contends that the prosecutor argued facts not in evidence by discussing in his opening statement that: (1) the One–Nines have violent rivalries with the Emerson Murder Boys, the Murder Squad, and the Double L, and (2) McDaniel is known as "Mookie" on the streets, and Double L has a member named Mookie who does not like sharing the nickname. As the trial progressed, the State did not present any evidence on those two points.

We reject McDaniel's argument that there was any prejudicial misconduct. In *State v. Bland*, 337 N.W.2d 378, 381 (Minn. 1983), we held that no prejudicial error occurred where a prosecutor discussed expected testimony in his opening statement but did not produce such evidence in the trial. "Many things might happen during the course of the trial which would prevent the presentation of all the evidence described in advance." *Id.* The prosecutor's second comment, about the defendant's nickname, was of little value. The more probative of the two comments—regarding the violent rivalries between the One–Nines and other gangs—was in fact supported generally by subsequent testimony even if the specific gangs identified in the opening statement were not identified in the testimony. In addition, the district court repeatedly instructed the jury that the lawyers' opening statements and closing arguments are not evidence that should be considered.

### 2. Misstating the Law

McDaniel alleges that the prosecutor misstated the law by: (1) attempting to lessen the State's burden of proof, and (2) misstating the law as to the elements of the offense.

▆▆▆ First, McDaniel points to the beginning of the prosecutor's closing argument:

> [T]hough the defendant comes in here cloaked with the presumption of innocence where the burden rests on me to prove his guilt beyond a reasonable doubt, many men and women have come into rooms just like this like he has, who have left these rooms after having been found guilty by proof beyond a reasonable doubt.

▆▆▆ In *State v. Martin*, 773 N.W.2d 89, 105 (Minn.2009), a case arising from the trial of the two men who shot Christopher Lynch, we stated that "[p]rosecutors improperly shift the burden of proof when they imply that a defendant has the burden of proving his innocence." *See also State v. Whittaker*, 568 N.W.2d 440, 451–52 (Minn.1997). A misstatement of this burden is "highly improper" and constitutes prosecutorial misconduct. *State v. Hunt*, 615 N.W.2d 294, 302 (Minn. 2000). However, a prosecutor's comment on the lack of evidence supporting a defense theory does not improperly shift the burden. *See State v. Race*, 383 N.W.2d 656, 664 (Minn.1986). Additionally, corrective instructions by the court can cure prosecutorial error. *Id.*

In *Martin*, we directly addressed the same alleged burden-shifting argument. The appellant claimed that the prosecutor reduced the State's burden of proof by stating that many people are still convicted under the "stiff burden" of proof beyond a reasonable doubt. *Martin*, 773 N.W.2d at 105. We concluded that the prosecutor's argument neither misstated nor shifted the burden of proof—rather, "it was a legitimate explanation of the State's burden." *Id.* We further found "no error, let alone plain error." *Id.* We reach the same conclusion here.

▆▆▆ A prosecutor commits misconduct by commenting on a defendant's failure to call a witness, because such a comment suggests that the defendant has some sort of burden of proof. *State v. Mayhorn*, 720 N.W.2d 776, 787 (Minn.2006). In *Mayhorn*, we determined that the prosecutor committed misconduct when he commented on the defendant's failure to call someone as an alibi witness to corroborate his version of events. *Id.*

McDaniel's argument does not persuade us. As in *Martin*, the prosecutor's statement that people have been convicted under the proof beyond a reasonable doubt

standard was a suggestion to the jury that the State's burden is not an impossible one. In addition, the prosecutor stated the burden of proof correctly. The prosecutor restated the burden of proof on the State to prove every element of the offense beyond a reasonable doubt numerous times throughout his closing argument, making any possible confusion or prejudice from this statement minimal at best. We see no error here.

■ Second, McDaniel contends that the State improperly misstated the law by saying that "all the State need[s] to prove was that the defendant was driving the car." Specifically, McDaniel relies on the prosecutor's statement: "Did the defendant, was he driving the car. If you say he was driving the car, then we have met our burden of proof with respect to each and every element of both of these crimes and the defendant is guilty beyond a reasonable doubt."

In *State v. Walsh*, 495 N.W.2d 602, 607 (Minn.1993), we emphasized that courts must look "at the closing argument as a whole, rather than just selective phrases or remarks that may be taken out of context or given undue prominence" to determine whether reversible error has occurred. As the State argues, the prosecutor's comment was addressing one of the central issues of the case—the identity of the driver. In addition, as with the burden of proof, the State clarified several times that it has the burden of proving each element of the offense beyond a reasonable doubt, and went through the other elements of the offense in detail during closing argument.

Finally, as the State notes, defense counsel also framed the issue of the driver's identity in a similar manner: "The trial is about is there proof beyond a reasonable doubt that Mr. McDaniel was the driver of that car. That is what the trial is

about. That's what we're here for. That's the evidence that we are looking at." As defense counsel did, the prosecutor was merely summarizing the key issue that would impact the jury's determination of guilt.

### 3. Inflaming the Passions and Prejudices of the Jury and Disparaging Defense Counsel

■ McDaniel asserts that the prosecutor inflamed the jury by "attempting to make this trial about gangs, rather than whether McDaniel committed the charged offense." Specifically, McDaniel argues that the prosecutor improperly used a theme of "arrogance" throughout the trial to describe gang behavior, and to discuss an incident that occurred during the trial when Willie Watkins, a close friend of McDaniel's and a member of the One–Nines, entered the courtroom to display a "trigger finger" while State witness Paris Patton testified. This was not improper conduct by the prosecutor. The prosecutor referred to the incident as an example of "gang" intimidation only, without deflecting responsibility onto McDaniel, and the court took several measures, including providing the jury with a cautionary instruction, to ensure that no prejudice to the defendant ensued.

■ McDaniel also alleges that the prosecutor repeatedly disparaged defense counsel and his role in the proceedings. In his rebuttal argument, the prosecutor stated:

There's a reason why attorneys' arguments, closing arguments, opening statements, questions and so forth are not evidence and cannot be considered by you as evidence. Because the attorneys will, oftentimes like to manipulate the evidence, make it what it isn't—hoping hopes that you don't recall the evidence

that was presented and then misrepresent the evidence to you and ask you to rely on their representations of the evidence as if that's the truth.

There's a reason why arguments aren't evidence and that is because, one of the reasons is because when the evidence that comes from the witness stand if it doesn't fit and an attorney stands up and gives you an explanation when that question was—when the opportunity for introducing that evidence was offered and passed by, it gives them the advantage by filling in the blanks for you in their own words when their clients can't do it for themselves.

In addition, referencing defense counsel's failure to ask a witness a particular question, the prosecutor stated: "Do you remember any question like that? Well that's because it's not true and counsel knows it's not true and misrepresents that to you." McDaniel argues that the comments qualified as disparagement because they suggest that the jury "can't consider what a defense attorney [says] as evidence . . . because they manipulate and lie on behalf of their clients."

▉▉▉▉ A prosecutor has special responsibilities as a representative of the people. Specifically,

[i]n final argument to the jury, a prosecutor is governed by a unique set of rules which differ significantly from those governing counsel in civil suits, and even from those governing defense counsel in the very same criminal trial. These special rules follow directly from the prosecutor's inherently unique role in the criminal justice system, which mandates that the prosecutor not act as a zealous advocate for criminal punishment, but as the representative of the people in an effort to seek justice.

*Walsh*, 495 N.W.2d at 606. Prosecutors "must avoid inflaming the jury's passions and prejudices" against defendants. *State v. Bailey*, 677 N.W.2d 380, 404 (Minn. 2004). Although a prosecutor can argue that a particular defense has no merit, a prosecutor "may not belittle the defense, either in the abstract or by suggesting that the defense was raised because it was the only defense that might succeed." *Martin*, 773 N.W.2d at 108 (citing *State v. Griese*, 565 N.W.2d 419, 428 (Minn.1997)).

We have generally found prejudicial prosecutorial misconduct only in extreme circumstances, and not when a prosecutor's comments are merely likely to confuse. *See, e.g., State v. Porter*, 526 N.W.2d 359, 363–64 (Minn.1995) (finding misconduct where the prosecutor told the jury that they would be "suckers" if they believed a defense witness and would need a sedative if they acquitted the defendant); *State v. Montjoy*, 366 N.W.2d 103, 108–09 (Minn.1985) (concluding that misconduct occurred when the prosecutor repeatedly asked the jury to teach the defendant a lesson and stated that a defendant's "rights end" when he commits a crime).

The prosecutor's comments here crossed the line between questioning opposing counsel's substantive arguments and questioning his personal credibility. Although the prosecutor initially seemed to have confined his comments to attorneys generally to justify why opening statements and closing arguments are not considered evidence, he transformed the argument into a personal attack when he accused defense counsel of misrepresenting the truth. Although the district court did not find prejudicial prosecutorial misconduct, it concluded that the "prosecutor's statements in this regard were overly aggressive and an ad hominem attack."

▉▉▉ Here, although the prosecutor's closing argument was disparaging and improper, we conclude that the misconduct

did not play "a substantial part in influencing the jury to convict," even under the more stringent *Caron* standard for serious, objected-to prosecutorial misconduct. *See Caron*, 300 Minn. at 128, 218 N.W.2d at 200. There was ample evidence that supported McDaniel's conviction for aiding and abetting first-degree premeditated murder, and the misconduct was sporadic, minimal, and rectified by the court's constant admonition that "arguments or statements by the lawyers are not evidence." We conclude that the prosecutor's misconduct did not have sufficient impact on the outcome of the case to require reversal.

## IV.

■ Finally, McDaniel argues that his sentence of life in prison without the possibility of release violates the Minnesota Constitution's prohibition against "cruel or unusual punishments." Minn. Const. art. I, § 5. McDaniel contends that the sentence imposed was unconstitutional because "it was disproportionate to McDaniel's intent," which McDaniel argues was "negligence plus" rather than intent or premeditation.

■ A conviction for aiding and abetting first-degree premeditated murder under Minn.Stat. § 609.185(a)(1) and Minn.Stat. § 609.05, subd. 1, results in a life sentence without the possibility of release. *See* Minn.Stat. § 609.106, subd. 2(1) (2008). We review the question of whether a statute is constitutional de novo. *State v. Caulfield*, 722 N.W.2d 304, 310 (Minn.2006). Where a defendant argues that a sentence violates the Cruel or Unusual Punishments Clause, we similarly exercise de novo review. *State v. Gutierrez*, 667 N.W.2d 426, 438 (Minn.2003). Because statutes are presumed constitutional, a person who challenges a sentence as cruel or unusual "bears the heavy burden ... of showing that our culture and laws

emphatically and well nigh universally reject the sentence." *State v. Chambers*, 589 N.W.2d 466, 479–80 (Minn.1999) (citation omitted) (internal quotation marks omitted).

Article 1 of the Minnesota Constitution prohibits "cruel or unusual punishments." Minn. Const. art. I, § 5. The language differs from the United States Constitution provision, which provides that no "cruel *and* unusual punishments" should be inflicted. U.S. Const. amend. VIII (emphasis added). We have explained that "[t]his difference is not trivial," and the Minnesota Constitution provides more protection than the U.S. Constitution. *State v. Mitchell*, 577 N.W.2d 481, 488 (Minn.1998). Although the clauses are different, we rely on the United States Supreme Court's construction of the Eighth Amendment to guide our interpretation of Article 1, Section 5, of the Minnesota Constitution.

■ When determining whether a punishment is cruel or unusual, we look to the proportionality of the crime to the punishment assigned. *Mitchell*, 577 N.W.2d at 489. In deciding whether a particular punishment is cruel and unusual, the U.S. Supreme Court determines whether the punishment comports with "evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (plurality opinion). Relying on this analysis in *Mitchell*, we concluded that because "we cannot say that the life imprisonment of a 15–year–old child convicted of first-degree murder offended evolving standards of decency in 1994 or was generally abhorrent to the community," such a punishment was not "cruel" under the Minnesota Constitution. 577 N.W.2d at 490. We also concluded that the punishment in *Mitchell* was not "unusual." *Id.*

McDaniel's argument does not persuade us to reach a different result here. First, McDaniel incorrectly relies on the Court's holding in *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), to argue that an aider and abettor cannot receive a sentence of life in prison without the possibility of release. In that case, the Supreme Court held that the Eighth Amendment prohibits the imposition of the death penalty for aiding and abetting felony murder, *id.* at 798, 102 S.Ct. 3368, but did not address the proportionality or constitutionality of a life sentence without the possibility of release for an aider and abettor of first-degree murder. Death sentences differ significantly from life imprisonment. *See Gardner v. Florida*, 430 U.S. 349, 357, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) (concluding that the death penalty "is a different kind of punishment from any other which may be imposed in this country"). Thus, *Enmund* does not provide useful guidance in this case.

Second, in assessing "cruel or unusual punishments," we have not distinguished between the principal actor and the aider and abettor. *See State v. Crow*, 730 N.W.2d 272, 280–82 (Minn.2007) (affirming conviction and sentence for first-degree murder for an aider and abettor who "played a knowing role in the commission of the crime" and was involved to the extent that a jury could infer criminal intent). Additionally, while there was no evidence of intent by the defendant to kill in the course of robbery in *Enmund*, 458 U.S. at 798, 102 S.Ct. 3368, there was evidence presented in this case that McDaniel intended to participate in killing Lynch, even though he did not personally pull the trigger. The jury heard evidence that McDaniel provided one of the murder weapons, and drove the car in an effort to "box" Mack–Lynch and Lynch in as the shooters chased the pair on foot. These facts support a conclusion that McDaniel intended to aid and abet what was going to be a murder.

We have never held that a life sentence without the possibility of release is cruel or unusual punishment within the meaning of the Minnesota Constitution when imposed on a defendant for aiding and abetting. *See, e.g., Crow*, 730 N.W.2d at 281–82 (holding that a life sentence without the possibility of release for aiding and abetting first-degree murder during the course of a kidnapping did not exaggerate "the criminality of [defendant's] conduct" even though he was not directly involved in the homicide); *State v. Heden*, 719 N.W.2d 689, 698 (Minn.2006) (holding that a life sentence without the possibility of release was not cruel or unusual for a defendant convicted of first-degree murder); *Chambers*, 589 N.W.2d at 480 (holding that a sentence of life imprisonment without the possibility of release for a 17–year–old convicted of first-degree murder of a peace officer did not constitute cruel or unusual punishment). Additionally, the legislative trend in Minnesota appears to be to increase the range of crimes subject to a mandatory life sentence. *See Crow*, 730 N.W.2d at 281 n. 5 ("In 2005, the legislature expanded the list of first-degree murder convictions subject to mandatory life without release.") (citing Act of June 2, 2005, ch. 136, art. 17, § 9, 2005 Minn. Laws 903, 1127) (codified as Minn.Stat. § 609.106, subd. 2). McDaniel has failed to carry his heavy burden of demonstrating that his sentence violates the Minnesota Constitution. We hold that the life sentence without the possibility of release is not unconstitutional as applied to McDaniel.

Affirmed.