**STATE of Minnesota, Respondent,**

v.

**Tierre Davon CALDWELL, Appellant.**

No. A11–292.

Court of Appeals of Minnesota.

April 16, 2012.

Lori Swanson, Attorney General, St. Paul, MN, and Michael O. Freeman, Hennepin County Attorney, Thomas A. Weist, Assistant County Attorney, Minneapolis, MN, for respondent.

Bradford S. Delapena, St. Paul, MN, for appellant.

Considered and decided by HALBROOKS, Presiding Judge; ROSS, Judge; and TOUSSAINT, Judge.*

## OPINION

ROSS, Judge.

Tierre Caldwell shot P.B. in the knee and was found guilty of first-degree assault, first-degree assault for the benefit of a gang, drive-by shooting, and drive-by shooting for the benefit of a gang. Caldwell argues on appeal that the district court abused its discretion by prohibiting his counsel from commenting to the jury on the state's failure to elicit an in-court identification of him from a testifying witness, that there was insufficient evidence to prove that he shot P.B. "for the benefit of a gang," and that his convictions of first-degree assault and drive-by shooting

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

should be vacated because they are lesser-included offenses. The district court appropriately prohibited Caldwell's counsel from commenting on the state's failure to elicit the in-court identification, and sufficient evidence establishes that Caldwell shot P.B. for the benefit of a gang. We therefore affirm in part. But we reverse and remand with instructions that Caldwell's convictions of first-degree assault and drive-by shooting be vacated as lesser-included offenses.

## FACTS

Based on the following events, the state charged Tierre Caldwell with, and a jury convicted him of, one count of first-degree assault committed for the benefit of a gang in violation of Minnesota Statutes section 609.221, subdivision 1 (2008) and section 609.229, subdivisions 2, 3(a), 4 (2008), and with drive-by shooting committed for the benefit of a gang in violation of Minnesota Statutes section 609.66, subdivision 1e (2008) and section 609.229, subdivisions 2, 3(a), 4 (2008).

P.B. met Caldwell through a friend and visited his house frequently for six to eight months. P.B. knew that Caldwell was a Crips gang member. He testified that he knows where the Crips gather and that they use special signs and handshakes. He also knows that the Crips sell drugs because he has seen them using the same signs and handshakes while engaging in public drug transactions.

P.B. visited with Caldwell in Stewart Park on the evening of May 19, 2009. Caldwell acted friendly toward P.B. After hanging out with Caldwell, P.B. walked across the street to Caldwell's house. Caldwell lingered in the park.

Several people were inside Caldwell's house: Keontre "Nu Nu" Holt, another male who had braided hair, and females. P.B. knew that Holt was affiliated with the Crips because he had seen him using the Crips' sign. He also knew that the male with braided hair was affiliated with the gang. The two males asked P.B. why he was at Caldwell's house and stated that they did not like him. Caldwell soon returned home with two other males, "Marty" and a "big dude."

Caldwell asked P.B. whether he wanted to be a Crip, specifically, "When you going to get down with the Crips?" P.B. responded, "never." P.B. testified that he perceived an immediate change in Caldwell's treatment of him. Caldwell laughed at P.B.'s response. P.B. attempted to shake Caldwell's hand but Caldwell kept his hand at his side. Caldwell's facial expression turned cold.

Holt then called P.B. out to the street, supposedly to "air box," which involves swinging playfully without striking. P.B. agreed, but Holt actually punched him. P.B. punched him back. Marty charged P.B. and swung at him. P.B. fled, and Caldwell also ran after him. P.B. ran through the park, and Caldwell and Marty stopped pursuing.

P.B. understood that declining an invitation to join the gang "would be considered [an act of] disrespect" leading to being beaten or shot. He ran to his house and stopped in front to talk to an acquaintance, Dyshay Driver. Driver sat in his car on a break from his job at nearby Abbott Northwestern Hospital. Driver testified that P.B. appeared to be frightened and told him that "he just got into a fight with some kid over—over some gang stuff."

While P.B. was still outside his house with Driver, Caldwell pulled up in one car and Marty in another. P.B. saw two other people in Caldwell's car—Holt and Caldwell's girlfriend—and he could hear Holt making aggressive comments, like, "I'll beat your ass."

Caldwell and Marty got out of their cars. P.B. noticed that Caldwell was holding a gun, carrying it down low, in front of his body. Caldwell said, "I'll kill you." Then Marty punched P.B. twice. Caldwell got back into his car, but P.B. could hear his girlfriend say, "Shoot—shoot that motherf----r! Shoot that motherf----r!" Caldwell again said to P.B., "I'll kill you. I'll shoot you." P.B., crying, replied, "Shoot me then! Shoot me then!" P.B. saw Caldwell reach out of his window with the gun, and Caldwell shot him in the knee cap. Both cars then backed up and left.

Police showed Driver a photo display that included Caldwell and others. He picked out Caldwell, saying that he "looked like the man who shot the victim," and the following day he positively identified Caldwell as P.B.'s shooter. At trial, Driver testified that the driver's side window of the first car was open when the shot was fired. Although he was not asked to point out Caldwell in court, he described the shooter in a manner that matched Caldwell's skin tone and hair style, saying that he "was hanging out [of the car] with the gun" and fired the shot.

Beth Miller, a patient at Abbott Northwestern Hospital, was smoking outside the hospital when she heard noises and saw a dark vehicle with at least two occupants pull up. She couldn't make out much of what was being said but she heard someone say, "Hey, what's up Dog? Do you remember me?" She heard someone else say, "Well then, just shoot me. Just shoot me then." Miller then heard the shot but couldn't see who fired it. She heard someone scream, "Oh, my gosh! Did he just shoot him?" and someone reply, "Yes." Miller dialed 911. She saw the dark vehicle drive away at a normal speed, but she never saw the second car.

At trial, Dennis Hackworth testified for the defense. Hackworth knows Caldwell because they played video games and cards together. He contradicted P.B.'s and Driver's testimony, asserting that the shooter had been in the second car, not Caldwell's.

After the jury found Caldwell guilty of first-degree assault committed for the benefit of a gang, drive-by shooting committed for the benefit of a gang, first-degree assault, and drive-by shooting, the district court sentenced him to 110 months in prison for first-degree assault for the benefit of a gang. It stated that Caldwell's sentences for drive-by shooting for the benefit of a gang, first-degree assault, and drive-by shooting "merge[d] with Count 1"—drive-by shooting for the benefit of a gang.

Caldwell appeals.

## ISSUES

I. Did the district court abuse its discretion by prohibiting Caldwell's counsel from arguing to the jury that one of the state's witnesses had not identified Caldwell as the shooter?

II. Did sufficient evidence support the jury's verdict convicting Caldwell of first-degree assault for the benefit of a gang?

III. Should Caldwell's convictions of first-degree assault and drive-by shooting be vacated because they are included offenses of first-degree assault for the benefit of a gang and drive-by shooting for the benefit of a gang?

## ANALYSIS

### I

Caldwell argues that the district court abused its discretion because it prohibited his counsel from arguing to the jury that Driver did not identify him in

court as the shooter. A criminal defendant has a constitutional due process right to present a complete defense. *State v. Atkinson*, 774 N.W.2d 584, 589 (Minn. 2009); *see also Herring v. New York*, 422 U.S. 853, 858–59, 95 S.Ct. 2550, 2553–54, 45 L.Ed.2d 593 (1975). That includes the right "to make all legitimate arguments on the evidence, to explain the evidence, and to present all proper inferences to be drawn therefrom." *Atkinson*, 774 N.W.2d at 589 (quotation omitted). But the district court "may limit the scope of a defendant's arguments to ensure that the defendant does not confuse the jury with misleading inferences." *Id.* We review a district court's restricting the scope of a closing argument for an abuse of discretion. *State v. Romine*, 757 N.W.2d 884, 892 (Minn.App.2008).

▮ Caldwell's counsel argued to the jury that the state had failed to prove beyond a reasonable doubt that Caldwell shot P.B. As support, he added, "Finally, when Mr. Driver was here in court yesterday he said absolutely nothing about this man sitting here. If he recognized that man [Caldwell] as the shooter, he could have told you that, but he didn't." The state objected. The district court sustained the objection, directing the jury to disregard the lawyer's last sentence.

Caldwell urges us to hold that because the shooter's identity was disputed at trial, the district court erroneously excluded the argument. The supreme court's reasoning in *State v. Davidson*, 351 N.W.2d 8 (Minn. 1984), leads us to a different conclusion. *Davidson* was a felon-in-firearm-possession case in which defense counsel contended during closing argument that the state had failed to produce evidence that the firearm had been checked for fingerprints. *Id.* at 9. The state objected and the district court sustained the objection. *Id.* at 9–10. The supreme court affirmed.

It reasoned that because neither the state nor defense counsel had questioned the police witness about whether the gun had been checked for fingerprints, the excluded argument would have invited speculation and caused confusion. *Id.* at 12–13. The supreme court recognized that "defense counsel is not required to ask a question blindly in order to try and build a record to justify . . . a comment in closing argument." *Id.* at 13. But it affirmed the argument's exclusion, observing that the defendant could have avoided a blind in-court inquiry by availing himself of the full pretrial discovery available to determine in advance whether the gun was checked and found to have fingerprints. *Id.* at 12–13.

Likewise here, Caldwell was appropriately foreclosed from drawing the jury to speculate over a matter he could have inquired about himself at trial. And although pretrial discovery could not have revealed exactly how Driver would later have responded if asked to identify Caldwell in court, it certainly revealed that Driver had already identified Caldwell as the shooter. Caldwell's attorney knew from discovery that asking Driver in court whether he could identify Caldwell would surely have led to damaging testimony. So his comment in his closing argument was inviting the jury to speculate that Driver could not identify Caldwell while he knew that Driver probably would have made an in-court identification if he had been asked to. Caldwell did not and does not now argue that the person whom Driver had previously identified in the photo array as the shooter was anyone other than Caldwell. The district court did not abuse its discretion by prohibiting Caldwell's counsel from inviting the jury to draw exculpatory inferences from Driver's failure to make an in-court identification.

## II

Caldwell also contends that the evidence was insufficient to prove that he had a

gang-related motive and specific intent to further criminal conduct by gang members when he shot P.B. We review insufficiency-of-evidence claims by determining whether the evidence in the record, when viewed in the light most favorable to the conviction, permits the jury to find the defendant guilty. *State v. Webb*, 440 N.W.2d 426, 430 (Minn.1989). In doing so, we analyze both the facts presented and the inferences the jury could reasonably draw from them. *State v. Robinson*, 604 N.W.2d 355, 365–66 (Minn.2000). We assume that the jury has evaluated witness credibility and believed the state's witnesses and disbelieved any contrary evidence. *State v. Tovar*, 605 N.W.2d 717, 726 (Minn.2000). We will not disturb the verdict if the jury, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably determine that the defendant is guilty of the charged offense. *State v. Alton*, 432 N.W.2d 754, 756 (Minn.1988).

■■■ Caldwell challenges only the "for the benefit of a gang" portion of his conviction of first-degree assault for the benefit of a gang. The state here had to prove that Caldwell shot P.B. intending to benefit the Crips, which Caldwell concedes is a criminal gang. A crime is committed for the benefit of a gang if "[a] person ... commits a crime for the benefit of, at the direction of, in association with, or motivated by involvement with a criminal gang" and "with the intent to promote, further, or assist in criminal conduct by gang members." Minn.Stat. § 609.229, subd. 2 (2008). "Intent must generally be proved by inferences from the defendant's conduct and the surrounding circumstances." *State v. Chuon*, 596 N.W.2d 267, 271 (Minn.App.1999), *review denied* (Minn. Aug. 25, 1999). And it can be proven by showing that the crime was motivated by the gang's concept of respect or punish-

ment for disrespect. *See State v. McDaniel*, 777 N.W.2d 739, 748–49 (Minn.2010) (stating that expert testimony about "the role of retaliation and respect in gang culture" assisted in proving motive to benefit a gang); *State v. Jackson*, 714 N.W.2d 681, 692 (Minn.2006) (stating that the expert's testimony about the role of respect in the Bloods' culture and that the victim was murdered for the Bloods because he showed disrespect was "helpful to establish the 'for the benefit of a gang' element").

P.B. testified that he was aware first-hand that Caldwell, Holt, and the unnamed male were all members of the Crips gang. To prove the "for the benefit of a gang" element, "firsthand-knowledge testimony" is preferred over expert testimony. *Jackson*, 714 N.W.2d at 691. As a threshold matter, Caldwell attacks P.B.'s credibility about gang culture and goals. But Caldwell is making this foundational challenge to P.B.'s testimony after having failed to preserve the issue by objecting at trial. His failure to preserve this objection waives his right to argue the issue on appeal. *See Van Buren v. State*, 556 N.W.2d 548, 551 (Minn.1996).

The circumstantial evidence supports the jury's implicit finding of intent. Very soon before Caldwell shot P.B., P.B. had declined Caldwell's invitation to join the Crips. Caldwell's laughing and refusing to shake P.B.'s hand corroborated P.B.'s testimony that Caldwell immediately transformed from acting friendly with P.B. to acting as his enemy. Before the moment that P.B. declined gang membership, P.B. routinely hung out at Caldwell's house and the two frequently exchanged handshakes. Based on P.B.'s testimony about gang culture, declining an invitation to join a gang "would be considered disrespect[ful]," and respect in gang culture is "really important." Caldwell's actions are consistent with P.B.'s testimony that if you disrespect

a gang or gang member, "you get jumped or shot." Driver similarly testified that when he saw P.B. after his fight with Holt, P.B. was afraid and said that he had just gotten in a fight over a gang-related matter. From all of this evidence, the jury could have reasonably inferred that Caldwell took P.B.'s choice to decline Caldwell's invitation to join the Crips as disrespect for the gang and that he shot P.B. as punishment.

## III

Caldwell also argues that his convictions of first-degree assault and drive-by shooting must be vacated because they are lesser-included offenses of his convictions of first-degree assault for the benefit of a gang and drive-by shooting for the benefit of a gang. A defendant "may be convicted of either the crime charged or an included offense, but not both." Minn. Stat. § 609.04, subd. 1 (2008). And "[i]n a crime committed for the benefit of a gang, the underlying crime is an included crime." *State v. Lopez–Rios,* 669 N.W.2d 603, 615 (Minn.2003) (citation omitted). The state concedes the point. The district court recognized that the last three counts merged with Caldwell's conviction of first-degree assault for the benefit of a gang. Because first-degree assault and drive-by shooting are lesser-included convictions of first-degree assault for the benefit of a gang and drive-by shooting for the benefit of a gang, Caldwell can be formally adjudicated guilty only of two of the crimes. The formal adjudication of guilt for the lesser-included offenses of first-degree assault and drive-by shooting should be vacated.

## DECISION

The district court did not abuse its discretion by prohibiting Caldwell's counsel from emphasizing to the jury that the state had failed to have Driver identify Caldwell during the trial, and there was sufficient evidence for the jury to convict Caldwell of first-degree assault for the benefit of a gang. We reverse in part and remand for the district court to amend the judgment to reflect Caldwell's convictions as first-degree assault for the benefit of a gang and drive-by shooting for the benefit of a gang.

**Affirmed in part, reversed in part, and remanded.**