*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1941**

State of Minnesota,
Respondent,

vs.

Cedric Chappell, Jr.,
Appellant.

**Filed January 4, 2016
Affirmed in part, reversed in part, and remanded
Ross, Judge**

Hennepin County District Court
File No. 27-CR-13-32197

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Linda K. Jenny, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Ross, Presiding Judge; Chutich, Judge; and Hooten, Judge.

**U N P U B L I S H E D   O P I N I O N**

**ROSS**, Judge

This case arises from a Minneapolis shootout killing one man and injuring another.

A jury found Cedric Chappell Jr. guilty of second-degree murder and attempted murder for

the benefit of a gang and first-degree riot for his involvement in a shooting outside a nightclub. Chappell contends that the state failed to prove beyond a reasonable doubt that he engaged in the misconduct for the benefit of a gang and that he is entitled to a new trial because of alleged deficiencies in the district court's instructions and alleged prosecutorial misconduct. Chappell also maintains that the district court erroneously sentenced him on the first-degree riot conviction. We conclude that the verdict rests on sufficient evidence and that the district court's instructions did not prejudice Chappell's substantial rights. Although Chappell's contention that the prosecutor committed misconduct finds support in the record, we do not order a new trial because the prosecutor's conduct did not infringe Chappell's substantial rights. But we reverse and remand for resentencing because, as the state concedes, the district court committed plain error by sentencing Chappell for the first-degree riot conviction.

## FACTS

The state charged Cedric Chappell with first-degree riot, second-degree murder for the benefit of a gang, and second-degree attempted murder for the benefit of a gang for a shooting outside a nightclub in south Minneapolis. The melee began with a skirmish inside the crowded Blue Nile at bar-closing time and then spilled outside where it erupted into multiple brawls. Police arrived and officers showered the crowd with pepper spray to suppress the fighting. Satisfied that the crowd was sufficiently diminished and the fight was over, police left. But the group had not fully dispersed and within half an hour the conflict intensified and police, still nearby, heard numerous gunshots and returned. The shooting left one man dead and another wounded in the leg.

2

At trial M.H., the wounded man, testified about the fight that continued after police left the immediate area. He said that Chappell ran up to him and W.S., the deceased man, and shot them. Chappell testified differently. He said that he was present in the nightclub when the skirmish began and present outside when the shooting occurred. He admitted that he fired a gun, that he was standing near people who he knew were members of a gang, and that he shot in the same direction they were shooting. But he said he was acting in self-defense and never left his spot in a parking lot across the street from where M.H. and W.S. were shot. The state did not commit to either theory particularly. It maintained alternatively that Chappell was guilty because he ran up and killed W.S. and injured M.H. or because he shot at them from across the street, possibly hitting them himself or at least aiding two other shooters who were gang members who shot W.S. and M.H. The state also maintained that, under either theory, the shooting resulted from an altercation between two gangs (the "Tens" and the "DTs").

Chappell testified in his own defense. He explained that he grew up in Minneapolis and was back in town visiting on a break from a North Dakota college where he attended school and played football. He said he went to the Blue Nile to attend a rap performance by a friend, A.W. He knew that his friends A.W., C.W., C.D., and others with them that night, were members of a gang known as "the Tens." He told the jury that he became involved in an argument outside the nightclub, that he heard others mention going to get guns, and that he crossed the street and entered a lot where his friend C.D. handed him a gun from his car. He said that P.L., another Tens member, fired first, along with someone he knew only as Malcolm (or Mauricio), also a Tens member. Chappell testified that during

3

the shooting he saw men ducking behind cars coming toward him. He said that he thought they might be the men he had argued with and that they might be shooting at him. Chappell also testified that a man (who by his attire was apparently W.S., the man who was killed) came out of the nightclub with a gun and began shooting. Chappell insisted that he was defending himself, saying that he fired two or three times from the parking lot across from the nightclub and then turned around and ran for his car. He denied that he ran toward M.H. and shot him.

M.H. gave the jury a different account. M.H. hosted the rap concert and brought his friend W.S. to the performance. He testified that when he and W.S. exited the nightclub after closing, he saw two people pointing at something and then saw P.L. shooting, but not in his direction. M.H. said that when the shooting began, he ducked in front of a car while W.S. tried unsuccessfully to reenter the nightclub. M.H. said that he saw someone wearing a red shirt and standing beside P.L., and he later learned that the man was Cedric Chappell. M.H. said he started running down an alley and then heard footsteps behind him. He turned around and saw Chappell. He told the jury that Chappell shot him in the leg, dropping him to the ground. M.H. said that he got up and again began to run. He saw W.S. running behind the nightclub.

Sergeants Christopher Gaiters and Robert Dale testified about their interview with Chappell. Both officers testified that Chappell said the underlying dispute was between two gangs, naming the Tens and the DTs. Sergeant Gaiters testified that C.D., who Chappell testified had handed him a handgun, was identified in law-enforcement databases as being associated with the Tens. Sergeant Dale testified that Chappell had identified P.L.

4

and Malcolm as other shooters and Tens members. Sergeant Dale also stated that Chappell told them he heard from P.L. and Malcolm about a death from the shooting.

P.L., a self-professed Tens member, also testified. P.L. admitted being present and firing his gun. He told the jury he shot into the air. The jury learned that the state had charged P.L. with two crimes for his involvement in the shooting: first-degree riot and being a prohibited person in possession of a firearm. And the jury learned that P.L. received a favorable plea deal in exchange for his testifying. P.L. testified that he began shooting because others were arguing with the Tens. He said that Chappell knew that P.L. was a member of the Tens and that Chappell was on the Tens' side in the fight because he also was arguing with and shooting at the competing group.

P.L. shared a jail unit with C.R., whom the state called to testify. C.R. told the jury that the Tens had fought with a group from north Minneapolis at the nightclub. C.R. stated that P.L. told him that a guy named "Ced" had shot at and hit someone and chased another person.

Officer Jaclyn Tuma testified. She specializes in investigating gang crimes. Officer Tuma described the Tens as a south-side Minneapolis gang and the DTs as a primarily north-side Minneapolis gang. She explained that gang participation ranges from operating in the gang as a member to merely currying favor with the gang as a nonmember. Officer Tuma told the jury that one commonly gains a gang's respect by being "especially violent, to carry guns, to shoot guns, to kind of feud with other gang members, to act on perceived slights." She testified that Chappell had a documented history with P.L., A.W., C.W., and

C.D., and that these four are all known Tens members. And she said that one of the rap performers that night was associated with the DTs.

The state presented physical evidence, primarily bullet casings found outside the nightclub. A forensic scientist specializing in ballistics testified that the casings indicated that the shooting involved at least four different guns. Three sets of casings were found in a parking lot across from the nightclub and a fourth set of casings was found in a residential area on a sidewalk north of the nightclub. Four shell casings were also found in the street near the nightclub close to two of the groupings of casings in the parking lot, near where M.H. testified he was shot. The ballistics expert testified that the casings in the street and one grouping of casings in the parking lot across from the nightclub had matching features consistent with being ejected from the same firearm.

The jury found Chappell guilty of second-degree murder for the benefits of a gang, attempted second-degree murder for the benefit of a gang, and first-degree riot. The district court sentenced Chappell for second-degree murder (273 months) and attempted murder (137 months), with the prison terms to run consecutively, and it sentenced him for first-degree riot (75 months), with the prison term to run concurrent with the others.

Chappell appeals.

# D E C I S I O N

Chappell challenges his conviction and sentence. He contends that the state failed to prove beyond a reasonable doubt that he engaged in the criminal conduct to benefit a gang, that the district court plainly erred in its accomplice-liability and expansive-liability jury instructions, that the prosecutor committed misconduct, and that the district court

improperly sentenced him for rioting because that crime resulted from the same behavioral incident as the murder charges. We are persuaded to reverse only on the sentencing argument.

**I**

Chappell first contends that the state did not prove beyond a reasonable doubt that the second-degree murder and attempted second-degree murder were committed for the benefit of a gang. The state sought to establish the for-the-benefit-of-a-gang element through circumstantial evidence. When we review a claim of insufficient evidence after the state provided only circumstantial evidence, we first identify the circumstances proved, deferring to the jury's decision to accept these circumstances as proved and to its decision to reject any evidence that conflicted with those circumstances proved. *State v. Silvernail*, 831 N.W.2d 594, 598–99 (Minn. 2013). In doing so, we construe conflicting evidence in the light most favorable to the verdict, assuming the jury believed the state's witnesses and disbelieved the contrary witnesses. *Id.* at 599. We next determine whether the circumstances proved are consistent only with guilt. *Id*. Under this approach, we will not affirm merely because the inferences that point to guilt are reasonable. *Id.* That is, we consider whether they are inconsistent with any reasonable theory other than guilt. *Id.*

The legislature has chosen to impose additional punishment for crimes committed "for the benefit of, at the direction of, in association with, or motivated by involvement with a criminal gang." Minn. Stat. § 609.229, subd. 2 (2012). The state must prove that when the defendant committed the underlying crime, he had "the intent to promote, further, or assist in criminal conduct by gang members." *Id.* Because criminals seldom announce

7

their specific intent, the intent to benefit a gang is generally proved using circumstances that tend to imply that the actor was motivated to meet a gang's conceptions of respect or punishment. *State v. Caldwell*, 815 N.W.2d 512, 517 (Minn. App. 2012), *review denied* (Minn. June 27, 2012). Chappell does not challenge this standard, but he essentially argues that, to find a defendant guilty of committing a crime for the benefit of a gang, the state must establish a *specific* gang-related motive for the underlying crime rather than a general, gang-benefiting motive.

Although it is true that some cases addressing a challenge to the for-the-benefit-of-a-gang determination have identified a specific gang-related motive, others have observed merely that some evidence connects the crime to gang purposes. *See State v. Matelski*, 622 N.W.2d 826, 829 (Minn. App. 2001) (upholding a benefit-of-a-gang conviction where the defendant and his accomplice shouted "Villa Lobos for life!" "That's what you get!" and "Next time would be worse!" after a shooting), *review denied* (Minn. May 15, 2001); *State v. Yang*, 774 N.W.2d 539, 550 (Minn. 2000) (upholding a benefit-of-a-gang conviction where the defendant and other gang members made gang signs while yelling and swearing at the victims shortly before attacking). We will therefore not limit our review to evidence that establishes that Chappell intended to aid the gang in some specific way.

We first identify the circumstances proved. The evidence considered in the light most favorable to the verdict informs us that the following circumstances were proved. Members of two gangs, the Tens and the DTs, were present at the nightclub. Chappell was admittedly friends with the Tens. Chappell had come to the nightclub with his Tens-member friends. Chappell perceived the underlying dispute as being between the Tens and

8

the DTs. Chappell knew that the men shooting—other than the Tens members—were in a gang from "over north." Tens gang member P.L. was first to shoot on the Tens behalf and described Chappell as being on their side in the fight against the DTs. Gangs foster varying levels of participation, such as gang hopefuls committing violent acts for favor with the gang, and gang members or supporters will back up the "personal beefs" that its members have with members of rival gangs. During or immediately preceding the gun battle, Chappell accepted a handgun from a Tens member, and he fired the gun in the same direction that the Tens members were firing. An additional proved circumstance is that Chappell murdered W.S. in the second-degree, which Chappell has conceded by challenging only the element of whether his motive for doing so was to benefit the gang.

These circumstances proved imply quite plainly that Chappell committed the underlying crimes (which he does not dispute on appeal) and that he did so for the benefit of the Tens gang. So we turn to consider whether one can rationally draw these inferences *only*, leaving no other reasonable hypothesis as to his motive for committing the crimes.

Chappell offers three other hypotheses, which he asserts are rational. He offers that the circumstances instead prove that he acted in self-defense, or that he overreacted to a perceived threat, or that he shot W.S. or M.H. mistaking them for the men he argued with inside the nightclub earlier. None of these is a reasonable hypothesis because all would contradict the circumstances proved.

Regarding Chappell's self-defense hypothesis, the jury rejected this affirmative defense and found him guilty of murder and attempted murder—findings that Chappell has not challenged on appeal. Although one can kill in self-defense, one cannot commit a

9

murder in self-defense. The jury's unchallenged determination that Chappell committed murder is itself enough for us to reject Chappell's first hypothesis as unreasonable under the circumstances proved.

Chappell's second hypothesis, that he overreacted to a perceived threat to himself, is a variation on the first. Under this hypothesis the jury implicitly accepted his contention that he killed or attempted to kill the victims in order to save himself from a threat but rejected his claim of self-defense specifically on the ground that he chose a level of force that exceeded the level reasonably necessary for his self-protection. *See State v. Glowacki*, 630 N.W.2d 392, 399 (Minn. 2001) (stating that to find a defendant acted in self-defense a jury must find that "the defendant reasonably believed that force was necessary and that the defendant used only the level of force reasonably necessary to prevent the harm feared"). The problem for Chappell here is that his challenge on appeal requires him to present a reasonable hypothesis *other than* guilt, and this hypothesis, even if it we assume it is reasonable, is not at all inconsistent with the jury's challenged finding that he acted to benefit the gang. One can *both* overreact to a perceived threat *and* act to benefit a gang in doing so. The overreaction can benefit a gang. Chappell could have intended to benefit the gang by his use of force that exceeded what was necessary to his supposed perceived threat to himself. Chappell's second hypothesis complements rather than contradicts the hypothesis he challenges, and it is no ground for reversal.

Chappell's third hypothesis fares no better than the first two. The notion that he shot W.S. or M.H. by mistaking them for men he had argued with at the nightclub earlier rather than because they were part of the Tens' rivals is implausible on the circumstances proved.

10

Chappell was handed the handgun by a Tens member in the middle of the violent clash between the Tens and a rival gang, and the only reasonable inference of that exchange is that Chappell accepted the gun intending to use it in the context of the clash, participating on the Tens' behalf. Nothing in the circumstances proved suggests that Chappell was handed the gun or received the gun to carry out some personal vendetta unrelated to the interests of his friends—known gang members in a gang shootout. Chappell asks us essentially to infer that when he shot the handgun in the same direction that the Tens gang members were shooting their guns, he had some reason for shooting that differed from their reason. We deem the hypothesis unreasonable.

The only reasonable hypothesis in this case is the most obvious one. Chappell stood and shot in concert with his friends and acquaintances—members of the Tens gang—in a street battle against a rival gang. And whether he joined the gun fight to curry favor with gang members, or to demonstrate his solidarity with gang members, or to help the gang dominate another gang, the jury found that the resulting murder and attempted murder are the consequence of his actions undertaken to benefit the Tens gang. We hold that Chappell's conduct was inconsistent with any rational hypothesis except his committing the crimes for the benefit of a gang.

**II**

Chappell argues that the district court's instructions about accomplice liability and expansive liability were erroneous. But he did not object at trial. We therefore review only for plain error. *See State v. Vance*, 734 N.W.2d 650, 655 (Minn. 2007), *overruled on other grounds by State v. Fleck*, 810 N.W.2d 303 (Minn. 2012). We will reverse only if we

11

identify an error, the error is plain, and the error affects Chappell's substantial rights. *Id.* at 655–56. It is plain error for a district court to fail to properly instruct the jury on all elements of the offense charged. *Id.* at 658.

***Accomplice-Liability Instruction***

Chappell argues that the district court plainly erred by providing an accomplice-liability instruction that did not contain the elements required by *State v. Milton*, instructing the jury that Chappell knew that his alleged accomplices were going to commit the crime or that he intentionally assisted in the crime. 821 N.W.2d 789, 805–06 (Minn. 2012). The defendant bears the burden to show that "there is a reasonable likelihood the jury's verdict would have been different had the jurors been specifically instructed that they could not find [the defendant] guilty unless they found that [he] knowingly and intentionally assisted another to commit the crime." *Id.* at 805. We need not decide whether the court committed plain error, because the evidence of Chappell's direct involvement as an actor was so overwhelming that there is no reasonable likelihood the jury's verdict would have changed if the requested elements were included.

M.H. identified Chappell as the man who ran up to him and W.S. and shot them. M.H.'s testimony places Chappell as the principal, which would negate prejudice from an improper accomplice-liability instruction. The jury also heard testimony supporting M.H.'s account from C.R., who testified that P.L. talked about the incident in jail. C.R. testified that P.L. told him that "Ced" opened fire and shot and hit one man and chased or advanced on another man. C.R. recounted that P.L. had told him that Chappell had "kind of like stepped forward and started going at the person that got shot in the leg."

12

Even if we suppose that the jury disbelieved M.H.'s testimony or questioned his ability to identify the shooter or dismissed C.R.'s hearsay as unreliable, the jury also heard testimony regarding physical evidence corroborating M.H.'s story about someone coming closer and shooting him. The ballistics specialist testified that the shell casings found in the street matched one grouping of shell casings found in the parking lot across from the nightclub. From this the jury would infer that one of the shooters, who M.H. testified was Chappell, left the parking lot and entered the street and shot M.H. and W.S.

Chappell does not meet his burden of showing that there is a reasonable likelihood that the jury would have found him not guilty if it had been instructed with the elements indicated by *Milton*.

### *Expansive Liability Instruction*

We reject Chappell's argument that the district court plainly erred by including an expansive-liability instruction without identifying what other crime Chappell intentionally aided. The supreme court recently held that a district court does not commit plain error where it fails to specify the originally intended crime in the jury instructions. *State v. Taylor*, 869 N.W.2d 1, 17 (Minn. 2015). Following *Taylor*, we hold that the district court did not plainly err by failing to identify the underlying crime that Chappell intentionally aided.

**III**

Chappell maintains that many of the prosecutor's statements were improper in misstating the law, vouching for credibility, disparaging the defense, and shifting the burden of proof. Most of his challenges are to statements that garnered no objection. Our

13

standard of review for improper statements made by a prosecutor depends on whether Chappell objected at trial. *State v. McDaniel*, 777 N.W.2d 739, 749 (Minn. 2010). When a defendant objected, we apply a two-tiered harmless-error test. *Id.* Under this test, if the misconduct is less severe, we consider whether the improper statement likely substantially influenced the jury's verdict. *Id.* And if the misconduct is more serious, we will reverse unless the misconduct is harmless beyond a reasonable doubt. *Id.*

When prosecutorial misconduct is not objected to, however, a modified, burden-shifting plain-error standard applies. *State v. Ramey*, 721 N.W.2d 294, 296 (Minn. 2006). The defendant must show that an error occurred and that the error was plain. *Id.* at 298. "An error is 'plain' if it is clear or obvious," and typically "contravenes case law, a rule, or a standard of conduct." *State v. Cao*, 788 N.W.2d 710, 715 (Minn. 2010). If the appealing defendant proves the first two elements, the burden shifts to the state to establish that the misconduct did not prejudice the defendant's substantial rights. *Ramey*, 721 N.W.2d at 302. That is, the state must show that "there is no reasonable likelihood that the absence of the misconduct in question would have had a significant effect on the verdict of the jury." *Id.* (quotation omitted). Whether this burden is met depends on the strength of evidence against the defendant, the pervasiveness of the misconduct, and the appellant's opportunity and effort to rebut the improper conduct. *State v. Davis*, 735 N.W.2d 674, 682 (Minn. 2007). When the alleged misconduct occurs during a prosecutor's closing argument, we review the closing as a whole rather than consider only the allegedly offending segment in isolation. *State v. Carridine*, 812 N.W.2d 130, 148 (Minn. 2012). If the state fails to establish that the appellant's substantial rights were not affected, still reversal is not certain.

Then we would determine if fairness and integrity in judicial proceedings compel us to correct the error. *Davis*, 735 N.W.2d at 682.

*Misstating the Law*

Chappell argues that the prosecutor misstated the law twice during his closing argument, first by generalizing the specific intent required for second-degree murder and next by misstating the standard for accomplice liability. These challenged statements were not objected to during trial. So we will apply the modified plain-error test. Chappell argues that the prosecutor misstated the law with an analogy to assault, confusing a general-intent crime (assault) with a specific-intent crime (second-degree murder):

> But let's say hypothetically you saw me in the course of trial punch [Chappell's attorney] in the head, that's an assault. An act with the intent to cause bodily harm. Well, what if I said wait a minute, I wasn't trying to cause him bodily harm, I was just showing him that I was upset with that cross-examination of Dr. Baker where he was haranguing him for not doing gun shot residue testing to see if this guy who had this gunshot wound in his back had committed suicide. And that may be why I punched him, but in criminal court we always intend the natural consequences of our actions. We don't care why I did it, we care did I mean to do it.

The prosecutor continued, "Same thing here. These weren't accidental shots. We don't care why you say you were doing it." Chappell also takes issue with the prosecutor's later reminder to the jury in concluding, "Remember what I told you about intent, there's only one intent when you are pointing a 9 mm at somebody and pulling the trigger multiple times."

It is prosecutorial misconduct to mislead the jury about the law. *State v. Salyers*, 842 N.W.2d 28, 36 (Minn. App. 2014), *aff'd*, 858 N.W.2d 156 (Minn. 2015). The

15

prosecutor's analogy is strange and confusing. But the analogy did not affect Chappell's substantial rights. The district court judge instructed the jury both at the beginning and end of the trial that the judge's instructions, not the attorneys' statements, are the law. Immediately before the prosecutor's closing statements the judge told the jury, "If an attorney's argument contains any statement of the law that differs from the law that I give you, you should disregard that statement." We presume that the jury follows the district court's instructions. *State v. Taylor*, 650 N.W.2d 190, 207 (Minn. 2002).

Although the district court's instruction will not always save a prosecutor's misstatement of law, we do not believe the prosecutor's statements here deviated from the law to the extent that it affected Chappell's substantial rights. Again, a great deal of evidence demonstrates Chappell's guilt either as the principal or an accomplice to the murder. We also recognize that because this statement occurred in the prosecutor's closing argument, as opposed to on rebuttal, Chappell's attorneys had the opportunity to address the statements, working against Chappell's claim of prejudice. We hold that the jury would not likely have acquitted Chappell if the prosecutor had not delivered the analogy.

Chappell also argues that the prosecutor misstated the law of accomplice liability using another hypothetical, this time illustrating a robbery with the prosecutor putatively driving a car and P.L. killing a cashier. The prosecutor's added explanatory comments tried to close the analogy, and he concluded by explaining that no evidence indicated that P.L. or Malcolm was the principal but that, if they were, the evidence demonstrated that Chappell aided them. Although the attempted parallel is again odd and was not presented very clearly, we do not see how unfair prejudice would arise from the argument.

16

*Vouching*

Chappell maintains that several of the prosecutor's closing statements constituted impermissible vouching for the strength of the state's case and the credibility of the state's witnesses. Again, Chappell did not object to any of these statements, so we review them for plain error.

During closing arguments, a prosecutor may not personally endorse a witness's credibility. *State v. Porter*, 526 N.W.2d 359, 364 (Minn. 1995). Impermissible vouching occurs when the state "implies a guarantee of a witness's truthfulness, refers to facts outside the record, or expresses a personal opinion as to a witness's credibility." *State v. Lopez-Rios*, 669 N.W.2d 603, 614 (Minn. 2003) (quotation omitted). But the state may argue that a witness is credible or incredible. *State v. Pendleton*, 759 N.W.2d 900, 912 (Minn. 2009). That is, counsel may "point to circumstances which cast doubt on a witness' veracity or which corroborates his or her testimony, but he may not throw onto the scales of credibility the weight of his own personal opinion." *State v. Ture*, 353 N.W.2d 502, 516 (Minn. 1984).

The line between a permissible supporting argument and an impermissible vouching statement can be hard to find, but we agree with Chappell that the prosecutor stepped over it here. When recounting Chappell's association with Tens members, the prosecutor announced, "I don't know how anybody could conclude that he did not commit this for the benefit of a gang." This statement essentially informs the jurors that the prosecutor would personally suppose any of them doltish for failing to find Chappell's criminal intent—a central disputed element at trial. The prosecutor opined that although he was certain that none of the jurors "would[] trust [C.R.] with [their] children," when "[P.L.] is in the jail

17

unit bragging that they were shooting 9 mms, and he saw Ced advancing on these two guys, I think the evidence is you can take that to the bank." This is a slightly closer question but the answer is the same. The prosecutor drew the jurors far too personally into the case by opining about how they might feel about placing their children in the care of a testifying, incarcerated witness. *Cf. State v. Mayhorn*, 720 N.W.2d 776, 786–87 (Minn. 2006) ("A prosecutor must not appeal to the passions of the jury."). We have said that a prosecutor's statement, "I suggest to you that Ms. Ruschmeyer was a very credible witness in this case," was not plain error because it was equivalent to the permissible expression of opinion "I submit." *State v. Anderson*, 720 N.W.2d 854, 864–65 (Minn. App. 2006), *aff'd on other grounds*, 733 N.W.2d 128 (Minn. 2007). But the statement here is not a mere suggestion ("I suggest") or a statement that clearly yields to the jury's role as fact finder ("I submit"). It is instead informative, revealing what the prosecutor personally believes the jury's proper finding should be ("I think"). We would be troubled by that statement even if it were made in isolation, and here it is aggravated by the other vouching statements. The prosecutor also declared, "[P.L.], on his face, is not a believable person. But when he got up on the stand and said [Chappell] was on our side, only the defense is going to argue with that." In context, the statement, "only the defense is going to argue with that," essentially declares the attorney's view that no reasonable, unbiased person could ever find the generally incredible witness incredible concerning his statement about Chappell's gang allegiance. The statement invites jurors to approach the credibility question with bias and to assume that any of them who dissents from the state's view is either irrational or partial. The

18

statement in context is misconduct, particularly considering all the vouching statements together. They constitute plain error.

But we conclude that the prosecutor's misconduct did not prejudice Chappell's substantial rights. Chappell had an opportunity through his attorney to point out the unreliability of P.L.'s and C.R.'s testimony, and his attorney did so with regard to P.L.'s statement that Chappell was on the Tens' side and with regard to P.L.'s and C.R.'s credibility in general. In addition to Chappell's having the opportunity to respond to the prosecutor's improper vouching statements, the jury heard overwhelming and largely uncontested evidence of Chappell's conduct in relation to the other combatants. The prosecutorial vouching, though inappropriate, was slight by comparison to the weight of evidence of guilt, largely on Chappell's own pretrial admissions and incriminating trial testimony. Without any dispute, Chappell attended the nightclub on the invitation of a known Tens gang member; was friends with several of the Tens who also attended; attended specifically in order to hear his friend, a Tens member, perform; participated in a violent melee in which Tens members were pitted against members of a different gang; accepted a handgun from a Tens member during the melee; witnessed Tens members opening fire on people from "over north" where the DTs were from; and fired shots in the same direction that Tens members were firing shots. The prosecutor's improper vouching on the question of Chappell's intent to benefit the gang avoids being a reversible error because of the overwhelming evidence of Chappell's intent. We hold that the misconduct by the prosecutor was plain error but that it did not prejudice Chappell's substantial rights.

*Disparaging the Defense*

Chappell argues that the prosecutor several times disparaged the defendant personally, his attorneys, and the defense he advanced. He made only one objection, which the district court sustained.

A prosecutor may argue bluntly that a particular defense being offered is meritless. *State v. Martin*, 773 N.W.2d 89, 108 (Minn. 2009). And he can make any argument rooted in the trial evidence. *See State v. MacLennan*, 702 N.W.2d 219, 236 (Minn. 2005). But the prosecutor may not belittle the defense abstractly or by suggesting that it was presented in desperation. *Id.*

Chappell maintains that the prosecutor disparaged him personally, comparing one witness to Chappell by saying, "Now, compare that body language to what you saw from the hot mess you saw on that stand yesterday. Which individual do you think was more sincere or genuine in their responses?" Chappell also objects to the comment, "There was only one person you heard from, in the course of this trial, that has the oldest, strongest, and most insidious motive to lie in the history of planet Earth. To lie to avoid consequences for actions you knew were wrong." Referring to Chappell or his testimony as "a hot mess" pushes the limits of tolerable courtroom behavior. But in context, the prosecutor tied his hyperbolic and flamboyant comments to the evidence, including the demeanor of witnesses presenting testimony in relation to the witnesses' credibility. *See Martin*, 773 N.W.2d at 106 (reaffirming that a prosecutor in closing argument may argue that a witness was not credible). In context we do not conclude that these statements constituted misconduct.

Chappell maintains that the prosecutor demeaned his theory of the defense. When discussing the fact that C.D. handed Chappell the gun before driving off in his car, the prosecutor stated:

> I'm not trying to denigrate the defense or what the Defendant said, but I would submit if we're going to seek justice, at some point we have to be realistic. And even if you want to buy that story, it kind of pokes a little bit about the assertion of self-defense does it not?

Later the prosecutor added:

> You heard the Defendant admit he was moving away from him when he fired in that direction. Nobody who shot [W.S.], whether it was this unidentified Malcolm, or whether it was the Defendant, was defending themselves. Never in the history of planet Earth has anybody been shot in the back righteously.

Chappell argues that both of these comments suggested to the jurors that they would be fools to believe Chappell's version of events, which embodied the self-defense argument, and that they also belittled Chappell's defense theory. We agree with the charge. Beginning an argument with "I'm not trying to denigrate the defense . . . *but*" and then ending it with, "Never in the history of the planet Earth" is sort of like beginning a debate line with "with all due respect" and then ending it with "moronic and perverted." But the main problem is that the argument offends the rule that "the prosecutor may not generally belittle a particular defense in the abstract." *State v. Ashby*, 567 N.W.2d 21, 28 (Minn. 1997). The proposition that no one in history has ever acted in self-defense while wounding an attacker in the back regardless of any other facts is one that can probably fall to multiple hypothetical examples. We need not offer any because, even if this were not so, the categorical declaration denouncing the defense is not proper argument to a jury. And the

term "righteously" suggests improperly that the question of self-defense hangs on a moral standard rather than a legal standard.

Chappell also argues that the prosecutor committed misconduct in his characterizing of the questioning or arguments of Chappell's attorney. For example, the prosecutor asked M.H. if he remembered Chappell's counsel "beating [him] up on cross-examination." He also described Chappell's cross-examination of the medical examiner as "haranguing." And he criticized the defense as having wrongly portrayed the victim, W.S., as a "mad beast." These are mere characterizations, albeit colorful and perhaps overstated characterizations, that Chappell had the opportunity to rebut and that the jury was free to reject. We do not see them as either reaching the level of misconduct or prejudicing Chappell's substantial rights. And as to the prosecutor's statement that was objected to and sustained, we again presume that the jury follows the district court's instructions to disregard objected to statements. *State v. Pendleton*, 706 N.W.2d 500, 509 (Minn. 2005).

### *Shifting the Burden of Proof*

Chappell argues that the prosecutor made various improper statements that shifted the burden of proof to the defense. Chappell objected and was overruled on one of the statements. We review the propriety of this statement under the two-tiered harmless error test already outlined. Chappell's attorney argued in closing that the prosecutor was more concerned with closing the case than seeking truth, citing the police's failure to recover a gun from C.D. The prosecutor rebutted by stating that Chappell had not given them C.D.'s last name so they were unable to locate the gun. The prosecutor stated:

> The cops should have done a search warrant on [C.D.]. Did he identify him as [C.D.]? No, he tried to do that same thing he did with Malcolm. It's [C.D.], I don't know who it is. Now, he comes here and he knows darn right it's [C.D.]. Maybe if he'd have said this is [C.D], so the officers didn't have to do a subsequent investigation, they could have got a search warrant in a timely manner and found that gun. And the proposition that this investigation failed because they didn't find the murder weapon, he's the one who gave it back to [C.D.].

Chappell argues that the prosecutor's argument implied that Chappell had a duty to turn the gun over in order to clear himself of the charges, effectively shifting the burden of proof from the state to Chappell. A prosecutor commits misconduct by commenting on a defendant's failure to call a witness or by contradicting testimony so as to suggest to the jury that the defendant bears some burden of proof. *Porter*, 526 N.W.2d at 365. Although the challenged statement could be similarly interpreted as shifting a burden of proof, it is counterbalanced by the fact that "the prosecutor has the right to respond to the arguments made by the defendant." *State v. Vue*, 797 N.W.2d 5, 16 (Minn. 2011). Because this statement was made during rebuttal and addressed an argument made by defense counsel that the police did not undertake a thorough investigation after Chappell's interview, we cannot consider the statement burden-shifting misconduct.

Chappell also contends that two statements in the prosecutor's opening argument shifted the burden of proof to the defense. Chappell first asserts that the prosecutor shifted the burden of proof by emphasizing gang retaliation for "snitching," which effectively excused any gaps in the state's case. Chappell points to the prosecutor's comments that gangs have "[o]ne essential rule that they follow with military-like discipline, you don't snitch ever. . . . This trial, you will see a textbook example of the don't snitch code in

23

action." Chappell similarly claims burden shifting occurred based on the comment, "Now, because he got rid of the murder weapon, we can't match these discharged casings up with any particular weapon." Chappell did not object.

We hold that there is no reasonable likelihood that the jury would have entered a verdict of not guilty but for these statements. The district court's written instructions stated several times that the state bore the burden. Even if the comments hint of burden shifting, they did not affect Chappell's substantial rights.

Although we do not reverse for the reasons stated, we repeat that Chappell's argument for prosecutorial misconduct is not without merit. Nothing in our affirming implies our approval of the prosecutor's language or tactics, which, but for the circumstances here, may have required reversal.

**IV**

Chappell challenges his sentence for the first-degree riot conviction. He argues that the sentence should be vacated because it punishes conduct that was part of the same behavioral incident as the murder and attempted-murder convictions. The state agrees with Chappell's argument. Our de novo review on the undisputed facts convinces us that the argument prevails. When a defendant's conduct constitutes more than one offense, he may be punished only for one of the offenses. Minn. Stat. § 609.035, subd. 1 (2012).

The district court made no findings as to the time, place, and motivation of the riot charge as compared to those of the other offenses. A comparison of these elements drives our review. *See State v. Soto*, 562 N.W.2d 299, 304 (Minn. 1997). Because all the riotous and murderous conduct occurred within the same episode, at the same location, at about

24

the same time, and with the same combative intent, the district court should not have sentenced Chappell on the riot conviction after sentencing him on the murder and attempted-murder convictions.

We therefore affirm in all respects except that we reverse and remand for the district court to correct the sentence.

**Affirmed in part, reversed in part, and remanded.**